[File No. 6550.]

THE FEDERAL LAND BANK OF SAINT PAUL, a Body Corporate, Appellant, v. LEO DeROCHFORD, a Sole Trader, Doing Business under the Name and Style of Molly's Service Station, and Berta E. Baker, as State Auditor of the State of North Dakota, Respondents.

(287 N. W. 522.)

Opinion filed July 15, 1939.   Rehearing denied August 11, 1939.

George F. Shafer and John Thorpe (Peyton R. Evans, Gerald E. Lyons and Robert J. Barry, of counsel) for appellant.

Alvin C. Strutz, Attorney General, and T. A. Thompson and B. F. Tillotson, Assistant Attorneys General, for respondent.

CHRISTIANSON, J.  The laws of North Dakota require each dealer "in motor vehicle fuel" to file with the state auditor a certificate showing that he is engaged in such business.  Initiated Measure, Laws 1927, p. 549, § 4.  They make it unlawful to engage in business in North Dakota "as a dealer, unless such dealer is the holder of an unrevoked license issued by the state auditor to engage in such business."  Laws 1935, chap. 172.

They require "each and every dealer in motor vehicle fuel" to render to the state auditor, not later than the 15th day of each calendar month, "a sworn statement of the number of gallons of motor vehicle fuel sold or used by him or them during the preceding calendar month."  Laws 1929, chap. 166, § 2.  They provide that:

"Said dealer shall pay a license tax of three cents per gallon on all motor vehicle fuel used and sold by him other than such fuel sold by him or them, in the original packages as above specified, and shall have the option of paying said tax of three cents per gallon on all motor vehicle fuel sold by him or them, in the state, in the original packages in which the same was imported as above specified.

"Whenever any sale is made by a dealer of motor vehicle fuel in the original packages in which the same was imported as above specified, such dealer shall deliver to the purchaser thereof an invoice of such motor vehicle fuel, stating the name and address of the purchaser, the quantity and kind of fuel sold, and whether or not said dealer assumes and agrees to pay the license tax on said fuel above specified, and such dealer shall transmit to the state auditor at the same time he shall render the statement above specified, duplicate copies of all such invoices issued and delivered by him during the period covered by such statement."  Laws 1929, chap. 166, § 2.

"Any person, firm or corporation who shall purchase or receive any

motor vehicle fuel from any dealer in this state in the original package in which the same shall have been imported, and upon which fuel the said dealer shall not have assumed to pay the tax as provided in this act, shall, on the 15th day of each month render to the state auditor the same statement required of the dealer by § 2 hereof, and at the same time shall remit and pay to said state auditor a license tax of two cents per gallon on such motor vehicle fuel, upon which the dealer has not assumed the tax." Initiated Meas. Laws 1927, pp. 547, 550, § 8.

"Every dealer paying such license tax or being liable for the payment thereof, shall be entitled to charge and collect the sum of three cents per gallon, on such motor fuel sold by him, as a part of the selling price thereof." Laws 1929, chap. 166, § 3.

"That any person or persons, firm or corporation who shall buy or use any motor vehicle fuel as defined in this Act, for the purpose of operating and propelling stationary gas engines, tractors used for agricultural purposes, motor boats, airplanes or aircrafts, or who shall purchase or use any of such fuel for lighting, heating, cleaning or dyeing or other commercial use of the same, except motor vehicles operated upon any of the public highways or streets in this state, on which motor fuel tax imposed by this Act has been paid, shall be reimbursed and repaid the amount of such tax paid by him on presentation to the state tax commissioner, on a form prescribed by the state tax commissioner, of a sworn statement setting forth. . . . Application for refunds or repayments shall not be made oftener than at the beginning of the quarter of each calendar year. . . . The state auditor shall furnish the tax commissioner with the information relating to the collection of the motor vehicle fuel tax and the tax commissioner shall withhold approval of any refund or repayment until the state auditor shall certify to the tax commissioner that the tax upon such motor fuel, on which refund or repayment is claimed, shall have been paid." Laws 1929, chap. 166, § 6, as amended by chap. 248, Laws 1937.

The defendant, Leo DeRochford, is a duly licensed dealer in motor vehicle fuel under the laws of North Dakota relating to the sale of such fuel, being engaged in such business at Bismarck, North Dakota. During August, September, and October, 1937, the Federal Land Bank

of St. Paul purchased from said DeRochford 150 gallons of gasoline for use in carrying on its activities within the state of North Dakota. A controversy arose as to whether the motor vehicle fuel sold by DeRochford to the defendant, Federal Land Bank, must be included in computing the amount of the tax to be paid by DeRochford to the state. The bank contended that the tax could not be constitutionally imposed upon the dealer for any motor vehicle fuel which it purchased from him for the purpose of carrying on its authorized activities within the state, and that consequently the dealer might not charge the amount of such tax as a part of the price. The defendants, DeRochford and the state auditor, on the other hand, contended that the motor vehicle fuel sold by DeRochford to the Federal Land Bank must be included in computing the tax and that consequently DeRochford might include the amount of such tax in the price. Action was brought for a determination of the controversy that had arisen and for a declaratory judgment adjudicating and determining the rights, liabilities, status and legal relations of the parties, and for a determination whether, in computing the amount of the tax against a dealer, motor vehicle fuel sold by him to a Federal Land Bank should be included or excluded. The trial court held that sales of motor vehicle fuel made to the Federal Land Bank should be included; that the dealer was required to pay a tax to the state, based upon such sales, and that accordingly he might fix the price of gasoline sold to the Federal Land Bank on that basis. Judgment was entered accordingly, and the Federal Land Bank of St. Paul has appealed.

The sole question presented for determination on this appeal is whether the state of North Dakota has the right to impose upon a licensed dealer in motor vehicle fuel a license tax of three cents per gallon upon motor vehicle fuel sold by such dealer to a Federal land bank for use in automobiles owned by said bank and operated by it incidental to its activities in the state.

The appellant, the Federal Land Bank of St. Paul, contends:

1. That the imposition of such tax is forbidden by § 26 of the Federal Farm Loan Act.

2. That it is forbidden by implication by the Constitution and laws of the United States because the Federal Land Bank of Saint Paul is an instrumentality of the United States, and the tax in question here

can in no event be imposed without the express consent of Congress and Congress has given no consent.

3. That if chapter 166, Laws of North Dakota for 1929, as amended, requires that in measuring the amount of the license tax of the defendant, DeRochford, as a licensed dealer in Motor Vehicle Fuel in this state, there must be included motor vehicle fuel sold by him to the plaintiff, the Federal Land Bank of Saint Paul, then said chapter 166, Laws 1929, as amended, violates clause 2 of Article 6 of the Constitution of the United States, which provides: "This Constitution, and the laws of the United States, which shall be made in pursuance thereof, . . . shall be the supreme law of the land; . . . anything in the Constitution or laws of any state to the contrary notwithstanding;" and, also, violates that part of § 8, cl. 18, of Article 1 of the Constitution of the United States, which provides: "The Congress shall have power: . . . To make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the Government of the United States, or in any department or officer thereof."

The laws of North Dakota contain no language from which it may be implied that there was any intention to except motor vehicle fuel sold to a Federal land bank, in computing the license tax of a dealer. In fact the statute providing for such tax does not exempt any motor vehicle fuel that is used or sold by a dealer, although it makes provision for a refund of the tax that has been paid upon motor vehicle fuel that was purchased and used for purposes other than for the operation of motor vehicles. Id. § 6. If a dealer is exempted from payment of a license tax upon motor vehicle fuel which he sells to a Federal Land Bank, such exemption does not arise on account of any provision in the laws of this state, but arises solely by virtue of the Constitution of the United States of America and the Acts of Congress. While the Federal Constitution contains no express limitation on the power of either a state or the National Government to tax the other, or its instrumentalities, since the decision in M'Culloch v. Maryland, 4 Wheat. (U. S.) 316, 4 L. ed. 579, the principle has been announced repeatedly by the Supreme Court of the United States that "the instrumentalities, means, and operations whereby the United States expresses its governmental powers are exempt from taxation by the states, and that the instru-

mentalities, means, and operations whereby the states exert the governmental powers belonging to them are equally exempt from taxation by the United States." It has been declared that "this principle is implied from the independence of the national and state governments within their respective spheres and from the provisions of the Constitution which look to the maintenance of the dual system." Indian Motocycle Co. v. United States, 283 U. S. 570, 575, 75 L. ed. 1277, 1281, 51 S. Ct. 601.

The decision of the Supreme Court of the United States (M'Culloch v. Maryland, 4 Wheat. (U. S.) 316, 4 L. ed. 579) which gave rise to the doctrine that the Constitution of the United States by necessary implication prohibits a state from laying a tax upon the instrumentalities of the National Government, also, sustained the power of Congress to "create corporations as appropriate means of executing the powers of government." The existence of such power has been reaffirmed in many subsequent decisions. Luxton v. North River Bridge Co. 153 U. S. 525–529, 38 L. ed. 808–810, 14 S. Ct. 891; Keifer v. Reconstruction Finance Corp. (decided February 27, 1939), 306 U. S. 381, 83 L. ed. 512, 59 S. Ct. 516; 4 Enc. U. S. Sup. Ct. Rep. 664. "For more than one hundred years corporations have been used as agencies for doing work for the government." Keifer v. Reconstruction Finance Corp. 306 U. S. 381, 83 L. ed. 512, 59 S. Ct. 516, supra.

The Federal Land Bank of St. Paul was established under authority of the Federal Farm Loan Act of July 17, 1916, 39 Stat. at L. 360, chap. 245, 12 U. S. C. A. § 641.

The Act provides that "every Federal land bank . . . , including the capital and reserve or surplus therein and the income derived therefrom, shall be exempt from Federal, state, municipal, and local taxation, except taxes upon real estate held, purchased, or taken by said bank . . . under the provisions of section eleven and section thirteen of this act. First mortgages executed to Federal land banks . . . , and farm loan bonds issued under the provisions of this act shall be deemed and held to be instrumentalities of the Government of the United States, and as such they and the income derived therefrom shall be exempt from Federal, state, municipal, and local taxation." 39 Stat. at L. 380, chap. 245, § 26, 12 U. S. C. A. § 931.

The Constitution of the United States provides: "This Constitu-

tion, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding." U. S. Const. Art. 6. The judicial power of the United States extends to all cases arising under the Constitution and the laws of the United States. U. S. Const. Art. 3, § 2.

"It follows necessarily from this constitutional provision that where a suit in the state court involves a question arising under the Constitution, laws, or treaties of the United States or, in other words, what is commonly called a 'Federal question,' a decision of the United States Supreme Court upon the point at issue is to be regarded as absolutely binding and authoritative; and in such case, if the supreme court of a state should entertain a different view, it will follow the Federal Supreme Court, reversing and overruling, if necessary, its own previous decisions to the contrary." 14 Am. Jur. 336, Courts, § 117; 15 C. J. pp. 930–932.

The questions in this case arise under the Constitution and laws of the United States. As said, there is no provision in the laws of this state requiring or permitting motor vehicle fuel sold to the United States or to any agencies or instrumentalities of the Federal Government to be deducted in computing the license tax imposed upon a dealer in motor vehicle fuel. If a licensed dealer is exempted from paying a tax based upon motor vehicle fuel sold by him to a Federal land bank, it is solely because of the immunity from taxation which the Constitution of the United States by implication confers upon the United States and upon agencies and instrumentalities of the United States.

The United States Supreme Court has consistently recognized a distinction between the extent of the power of a state to tax the instrumentalities of the National Government and the power of the National Government to tax state instrumentalities. That distinction was recognized and pointed out by Chief Justice Marshall in M'Culloch v. Maryland (decided in February, 1819), 4 Wheat. (U. S.) 316, 4 L. ed. 579, supra, and was again declared in Helvering v. Gerhardt (decided in 1938) 304 U. S. 405, 412, 82 L. ed. 1427, 1432, 1433, 58 S. Ct. 969, and in Graves v. New York (decided in 1939) 306 U. S. 466, 83 L. ed. 927, 59 S. Ct. 595, 120 A.L.R. 1466.

Since all valid congressional enactments are the supreme law of the land and beyond interference by a state, the validity of state taxation of Federal instrumentalities must depend upon (1) the power of Congress to create the instrumentality, and, (2) the intent of Congress as manifested by law to protect it from, or to render it subject to, state taxation.

The Supreme Court of the United States has ruled that Congress acted within its constitutional powers, (a) in creating the Federal land banks, and, (b) in exempting farm loan bonds issued by such banks from Federal, state, municipal and local taxation. Smith v. Kansas City Title & T. Co. 255 U. S. 180, 65 L. ed. 577, 41 S. Ct. 243. The Court has declared that such banks "are instrumentalities of the Federal Government, engaged in the performance of an important governmental function." Federal Land Bank v. Priddy, 295 U. S. 229, 231, 79 L. ed. 1408, 1411, 55 S. Ct. 705. That Court, also, has "condemned, as beyond the constitutional power of the state, a statute subjecting mortgages executed to a Federal land bank to the payment of a recording tax" (Federal Land Bank v. Crosland, 261 U. S. 374, 67 L. ed. 703, 43 S. Ct. 385; 29 A.L.R. 1); and has held that a state cannot constitutionally tax income arising from farm loan bonds issued by a Federal land bank. Macallen Co. v. Massachusetts, 279 U. S. 620, 73 L. ed. 874, 49 S. Ct. 432, 65 A.L.R. 866.

The decisions of the United States Supreme Court are binding upon this court and definitely establish, (1) that a Federal land bank is an instrumentality of the National Government, created by Congress, acting within its constitutional powers, to perform authorized governmental functions, and, (2) that such bank is constitutionally endowed with the same immunity from state taxation, that the National Government itself would have been endowed with, if it had engaged in such activity directly.

When Congress creates a corporation to carry on some activity that the National Government may constitutionally undertake, such corporation may be endowed with the government's immunity from suit Keifer v. Reconstruction Finance Corp. 306 U. S. 381, 83 L. ed. 512, 59 S. Ct. 516, supra), and from taxation. Smith v. Kansas City Title & T. Co. 255 U. S. 180, 65 L. ed. 577, 41 S. Ct. 243, supra; see also Graves v. New York, 306 U. S. 466, 83 L. ed. 927, 59 S. Ct. 595, 120

A.L.R. 1466, supra. Whether such immunity exists, and if so the extent thereof, are questions of congressional intention. Federal Land Bank v. Priddy, 295 U. S. 229, 79 L. ed. 1408, 55 S. Ct. 705, and Smith v. Kansas City Title & T. Co. 255 U. S. 180, 65 L. ed. 577, 41 S. Ct. 243, supra.

In the act providing for the establishment of Federal land banks (Federal Farm Loan Act) there is a clear intimation that real estate acquired by a Federal land bank in the course of its operations under the Act shall be subject to taxation; and there is a specific declaration that "every Federal land bank . . . including the capital and reserve or surplus therein and the income derived therefrom, . . . first mortgages executed to Federal land banks . . . , and farm loan bonds . . . and the income derived therefrom shall be exempt from . . . state, municipal and local taxation."

It is reasonable to assume that when Congress said that a state might not tax a Federal land bank, its capital, reserve or surplus, or the income derived therefrom, or first mortgages executed to the Bank, or farm loan bonds, or income derived therefrom, it had in mind direct and discernible taxes, and that it did not have in mind taxes imposed upon and collected from other persons with whom the bank might transact business, which might indirectly result in some slight increase in the operating expenses of the Bank. The tax in question here is not a tax upon a Federal land bank, or upon its capital, reserve or surplus, or the income derived therefrom. Neither is it a tax upon mortgages executed to such Bank, or upon farm loan bonds, or upon the income derived therefrom. The tax is one upon a dealer in motor vehicle fuel, who has applied for, and who has been granted, a license, under the laws of this state, to engage in business as a dealer in motor vehicle fuel.

The Farm Loan Act, if given a construction most favorable to the plaintiff Bank, discloses no intention either to grant or to withhold immunity from the indirect effect upon the Bank of the imposition of the tax in question here.

"It is true that the silence of Congress, when it has authority to speak, may sometimes give rise to an implication as to the congressional purpose. The nature and extent of that implication depend upon the nature of the congressional power and the effect of its exercise.

But there is little scope for the application of that doctrine to the tax immunity of governmental instrumentalities. The constitutional immunity of either government from taxation by the other, where Congress is silent, has its source in an implied restriction upon the powers of the taxing government. So far as the implication rests upon the purpose to avoid interference with the functions of the taxed government or the imposition upon it of the economic burden of the tax, it is plain that there is no basis for implying a purpose of Congress to exempt the Federal Government or its agencies from tax burdens which are unsubstantial or which courts are unable to discern. Silence of Congress implies immunity no more than does the silence of the Constitution. It follows that when exemption from state taxation is claimed on the ground that the Federal Government is burdened by the tax, and Congress has disclosed no intention with respect to the claimed immunity, it is in order to consider the nature and effect of the alleged burden, and if it appears that there is no ground for implying a constitutional immunity, there is equally a want of any ground for assuming any purpose on the part of Congress to create an immunity." Graves v. New York, 306 U. S. 466, 83 L. ed. 927, 59 S. Ct. 595, 120 A.L.R. 1466.

Is the license tax imposed by the laws of this state upon a licensed dealer in motor vehicle fuel if, and as, applied to motor vehicle fuel sold by him to a Federal land bank, violative of the Constitution of the United States? Does the imposition by the state of the license tax upon such dealer as to that part of his business which consists of sales of motor vehicle fuel to a Federal land bank infringe upon powers granted to the Federal Government by the Constitution of the United States? Does such imposition in any manner, or at all, place a burden upon, interfere with, or obstruct the exercise of the powers of, the National Government? Does it interfere with, or impair, the efficiency of a Federal land bank in performing the functions it was designed to perform for the Federal Government? Is such tax one upon an instrumentality of the Federal Government, or upon the means and operations whereby the Federal Government exercises its powers?

If there were no pronouncement by the Supreme Court of the United States other than M'Culloch v. Maryland, and the subsequent decisions which accepted and applied the rule of immunity of Federal

agencies and instrumentalities from state taxation announced in that case, prior to the decision in Panhandle Oil Co. v. Mississippi (decided May 14, 1928) 277 U. S. 218, 72 L. ed. 857, 48 S. Ct. 451, 56 A.L.R. 583, we should have no hesitancy in holding that the state did not transcend its constitutional powers by imposing the tax in question here upon a dealer for motor vehicle fuel sold by him to the Federal land bank. The tax involved in M'Culloch v. Maryland was imposed directly upon the operations of an instrumentality of the Federal Government, and affected it alone. There the state had singled out an instrumentality of the Federal Government, and by means of a prohibitive tax sought to place such burden upon the authorized operations of such instrumentality as to make it difficult, if not impossible, for it to perform the very function it was designed to perform. In the opinion in M'Culloch v. Maryland, the great Chief Justice referred to the tax, which a state is inhibited from imposing—(by the principle that the Constitution of the United States of America and the laws made in pursuance thereof are the supreme law of the land)—as a tax on "the means of the Government of the Union for the execution of its powers," as a tax on "the operations of the Government of the United States," and as "a tax on the operation of an instrument employed by the Government of the Union to carry its powers into execution." In declaring the doctrine of immunity of the means and operations of the Federal Government from control or impediment by a state, "by taxation or otherwise," he recognized and pointed out that the doctrine was limited by the very reasons which brought it into being. Said he:

"The sovereignty of a state extends to everything which exists by its own authority, or is introduced by its permission; but does it extend to those means which are employed by Congress to carry into execution—powers conferred on that body by the people of the United States? We think it demonstrable that it does not. Those powers are not given by the people of a single state. They are given by the people of the United States, to a government whose laws, made in pursuance of the Constitution, are declared to be supreme.—Consequently the people of a single state cannot confer a sovereignty which will extend over them.

"If we measure the power of taxation residing in a state, by the

extent of sovereignty which the people of a single state possess, and can confer on its government, we have an intelligible standard, applicable to every case to which the power may be applied. We have a principle which leaves the power of taxing the people and property of a state unimpaired; which leaves to a state the command of all its resources, and which places beyond its reach, all those powers which are conferred by the people of the United States on the Government of the Union, and all those means which are given for the purpose of carrying those powers into execution. We have a principle which is safe for the states, and safe for the Union. . . . We are not driven to the perplexing inquiry, so unfit for the judicial department, what degree of taxation is the legitimate use, and what degree may amount to the abuse of the power. The attempt to use it on the means employed by the Government of the Union, in pursuance of the Constitution, is itself an abuse, because it is the usurpation of a power which the people of a single state cannot give.

"We find then, on just theory, a total failure of this original right to tax the means employed by the Government of the Union, for the execution of its powers. . . .

"The court has bestowed on this subject its most deliberate consideration. The result is a conviction that the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control the operation of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government. . . .

"This opinion does not deprive the states of any resources which they originally possessed. It does not extend to a tax paid by the real property of the bank, in common with the other real property within the state, nor to a tax imposed on the interest which the citizens of Maryland may hold in the institution, in common with other property of the same description throughout the state. But this is a tax on the operations of the bank, and is, consequently, a tax on the operation of an instrument employed by the Government of the Union to carry its powers into execution." 4 Wheat. (U. S.) 429–437, 4 L. ed. 607–609.

In subsequent decisions the Supreme Court of the United States had occasion to further consider and define the limitations of the doctrine of immunity of Federal instrumentalities from state taxation. First

Nat. Bank v. Kentucky, 9 Wall. (U. S.) 353, 19 L. ed. 701; Union P. R. Co. v. Peniston, 18 Wall. (U. S.) 5, 21 L. ed. 787

In First Nat. Bank v. Kentucky, 9 Wall. (U. S.) 353, 361, 362, 19 L. ed. 701, 703, it was said:

"But it is argued that the banks, being instrumentalities of the Federal Government, by which some of its important operations are conducted, cannot be subjected to such state legislation. It is certainly true that the Bank of the United States and its capital were held to be exempt from that state taxation on the ground here stated, and this principle, laid down in the case of M'Culloch v. Maryland, 4 Wheat. (U. S.) 316, 41 L. ed. 579, has been repeatedly affirmed by the court. But the doctrine has its foundation in the proposition, that the right of taxation may be so used in such cases as to destroy the instrumentalities by which the government proposes to effect its lawful purposes in the states, . . . The principle we are discussing has its limitation, a limitation growing out of the necessity on which the principle itself is founded. That limitation is, that the agencies of the Federal Government are only exempted from state legislation, so far as that legislation may interfere with, or impair their efficiency in performing the functions by which they are designed to serve that government. Any other rule would convert a principle founded alone in the necessity of securing to the Government of the United States the means of exercising its legitimate powers, into an unauthorized and unjustifiable invasion of the rights of the states."

In Union P. R. Co. v. Peniston, 18 Wall. (U. S.) 5, 21 L. ed. 787, it was said:

"It is . . . true that the states may not levy taxes the direct effect of which shall be to hinder the exercise of any powers which belong to the National Government. The Constitution contemplates that none of those powers may be restrained by state legislation. But it is often a difficult question whether a tax imposed by a state does in fact invade the domain of the general government, or interfere with its operations to such an extent, or in such a manner, as to render it unwarranted. It cannot be that a state tax which remotely affects the efficient exercise of a Federal power is for that reason alone inhibited by the Constitution. To hold that would be to deny to the states all power to tax persons or property. Every tax levied by a state with-

draws from the reach of Federal taxation a portion of the property from which it is taken, and to that extent diminishes the subject upon which Federal taxes may be laid. The states are, and they must ever be, co-existent with the National Government. Neither may destroy the other. Hence the Federal Constitution must receive a practical construction. Its limitations and its implied prohibitions must not be extended so far as to destroy the necessary powers of the states, or prevent their efficient exercise. . . .

"It is . . . manifest that exemption of Federal agencies from state taxation is dependent, not upon the nature of the agents, or upon the mode of their constitution, or upon the fact that they are agents, but upon the effect of the tax; that is, upon the question whether the tax does in truth deprive them of power to serve the government as they were intended to serve it, or does hinder the efficient exercise of their power. A tax upon their property has no such necessary effect. It leaves them free to discharge the duties they have undertaken to perform. A tax upon their operations is a direct obstruction to the exercise of Federal powers."

The difference between the tax in question here and the possible effect of such tax upon the operations of a Federal land bank, and the tax involved in M'Culloch v. Maryland, and the obvious effect of that tax upon the operations and the very existence of the United States Branch Bank are self-evident. The tax held unconstitutional in M'Culloch v. Maryland was a direct tax "laid upon the notes of the bank. The institution was prohibited from issuing notes at all except upon stamped paper furnished by the state, and to be paid for on delivery, the stamp upon each note being proportioned to its denomination. The tax, therefore, was not upon any property of the bank, but upon one of its operations; in fact, upon its right to exist as created. It was a direct impediment in the way of a governmental operation performed through the bank as an agent." Union P. R. Co. v. Peniston, 18 Wall. (U. S.) 5, 21 L. ed. 787, supra.

The tax involved here is a tax imposed on dealers for the privilege of engaging in the business of selling motor vehicle fuel, and the amount of the tax is measured by the number of gallons "used and sold" by the dealer. It is not a tax upon a Federal land bank or upon any function which such bank is authorized to perform. It is not a tax upon

any of the powers with which the bank is vested. The bank may exercise every function and perform every act that it was created to exercise and perform without 1 cent of its funds being expended or 1 cent of its profits being taken away because of this tax. The tax cannot be laid directly upon any activity of the bank unless it engages in business as a licensed dealer of motor vehicle fuel in this state, and the bank was not created for the purpose of engaging in such business. The only way in which the funds of the bank may be expended, even indirectly, in the payment of the tax will be if the bank purchases motor vehicle fuel from a dealer who includes the amount of the tax in the sales price. But if the operating expenses of the bank are increased because of the imposition of the tax upon a dealer from whom the bank purchases motor vehicle fuel, that effect is only incidental and remote and cannot be said to be a tax upon the bank, its capital, reserve or surplus, or upon any of the operations of the bank. Every tax laid upon a dealer will, of course, to some extent be reflected in the price which he charges for the commodity which he sells. James v. Dravo Contracting Co. 302 U. S. 134, 160, 82 L. ed. 155, 172, 58 S. Ct. 208, 114 A.L.R. 318. If the law of this state, instead of requiring a licensed dealer to pay a license fee of three cents (3¢) per gallon, had fixed a license fee of a definite sum without regard to the quantity sold, and the amount so fixed had equalled or exceeded 3 cents per gallon, the dealer, in computing his operating costs, would doubtless have fixed the price of motor vehicle fuel sufficiently high to enable him to pay such tax without loss to himself. In such case, if the United States or one of its agencies or instrumentalities had purchased motor vehicle fuel the cost of such fuel would, of course, have been increased on account of the tax, just as it is increased by the taxes laid by the state upon the property and income of the dealer. But we are not aware of any decision that has gone to the extent of holding that where the Federal Government or one of its instrumentalities makes a purchase of some commodity, or enters into a contract with someone to perform a service for it, that there must be an analysis of the extent to which the amount charged for the service rendered or for the commodity sold is increased on account of state and municipal taxes imposed upon the contractor or the seller, and that the amount of such increase must be deducted from the amount charged the government,

or its instrumentality, for the service rendered or the commodity fur-nished. On the contrary, the Supreme Court of the United States has held that an occupation tax measured by gross income, where imposed by a state upon a contractor with the United States, is not invalid as a tax upon the Federal Government and its operations, even though the imposition of the tax may increase the cost to the government. James v Dravo Contracting Co. 302 U. S. 134, 160, 82 L. ed. 155, 172, 58 S. Ct. 208, 114 A.L.R. 318; Alward v. Johnson, 282 U. S. 509, 75 L. ed. 496, 51 S. Ct. 273, 75 A.L.R. 9.

The tax in question here is measured by the number of gallons of motor vehicle fuel used and sold by a licensed dealer "irrespective of intrinsic value or price obtained upon sale." The motor vehicle fuel "may be disposed of at any price without affecting the amount of the tax; that does not vary." Always the dealer must pay a license tax amounting to 3 cents upon each gallon—no more, no less. Liggett & M. Tobacco Co. v. United States, 299 U. S. 383, 386, 81 L. ed. 294, 296, 297, 57 S. Ct. 239.

The tax is general and nondiscriminatory. The law imposes the same license tax upon all motor vehicle fuel sold by a licensed dealer without regard to whom the purchaser may be. It also provides the same basis for a refund of taxes that have been paid. It provides "that any person or persons, firm or corporation who shall buy or use any motor vehicle fuel as defined in this act, for the purpose of operating and propelling stationary gas engines, tractors used for agricultural purposes, motor boats, airplanes or aircraft, or who shall purchase or use any such fuel for lighting, heating, cleaning or dyeing or other commercial use of the same, except motor vehicles operated upon any of the public highways or streets in this state, on which motor vehicle fuel tax imposed by this act has been paid, shall be reimbursed and re-paid the amount of such tax paid by him on presentation to the state tax commissioner, of a sworn statement. . . ." Laws 1937, chap. 248. Under the law, sales to the state, to any agency of the state, to any city or county, to a corporation or to an individual, stand on pre-cisely the same plane. All motor vehicle fuel sold by a licensed dealer must be considered in determining the amount of his license tax. No sales are excepted in computing the amount of the tax. While refund of the amount of the tax is authorized in case the motor vehicle fuel

has been bought and used for purposes other than in the operation of motor vehicles, the refund is made to whoever actually paid the tax. The law does not require that the tax be passed on to the purchaser. The dealer may pay part or all of the tax on all sales or on any sale; but the law says "every dealer paying such license tax or being liable for the payment thereof, shall be entitled to charge and collect the sum of 3 cents per gallon, on such motor vehicle fuel sold by him, as a part of the selling price thereof."

In this case the dealer (DeRochford) fixed the price which he charged for the gasoline that he sold to the Land Bank with the tax in mind, that is, in fixing the price he added the amount of the tax he would be required to pay to the state. But the Land Bank was not required to take the gasoline from DeRochford; it could take it or leave it. If it thought the price too high, it did not have to purchase. If DeRochford had seen fit to increase the price to the Land Bank over what he charged the public at large, the Bank could not have compelled him to sell to it at a lesser price. 277 U. S. 224, 72 L. ed. 859, 48 S. Ct. 451, 56 A.L.R. 583.

The refund provisions of the law disclose that it was the legislative intention to impose the tax upon a dealer on all motor vehicle fuel used in the operation of motor vehicles that operate, wholly or at times, upon the public highways or streets of this state. The proceeds of the tax are directed to be used primarily for the construction and maintenance of public highways. If a licensed dealer in motor vehicle fuel is exempted from paying a tax on motor vehicle fuel sold by him to a Federal land bank for use, and used by it, in operating its automobiles upon the public highways and streets in this state, then there will be no such contribution into the fund provided by the laws of the state for the construction and maintenance of highways, for the wear and tear of the highways caused by such automobiles while being so operated, as the laws of the state contemplate shall be made for motor vehicles that are operated upon the public highways and streets of this state.

If it were not for the decision of the Supreme Court of the United States in Panhandle Oil Co. v. Mississippi, 277 U. S. 213, 72 L. ed. 857, 48 S. Ct. 451, 53 A.L.R. 583, supra, we should not think there could be any basis under the rule announced in M'Culloch v. Mary-

land for a claim that the imposition by the state of the tax in question here upon a licensed dealer in motor vehicle fuel of a license tax measured by the amount of motor vehicle fuel sold by him would be repugnant to the Constitution of the United States as to such amount of the tax as is based upon motor vehicle fuel sold by him to a Federal land bank; but, that decision holds to the contrary; and if the rule of that decision still prevails the license tax prescribed by the laws of this state can not be constitutionally imposed upon DeRochford as to the gasoline he sold to the Federal Land Bank. That case arose under a law of the state of Mississippi which provided that: "Any person engaged in the business of distributor of gasoline, or retail dealer of gasoline, shall pay for the privilege of engaging in such business an excise tax of three cents (3¢) per gallon upon the sale of gasoline by such dealer in this state." (An amendment increased the tax to 4¢ per gallon, and some of the sales involved were made while each of these rates were in effect.) 147 Miss. 669, 112 So. 584.

The Panhandle Oil Company sold gasoline to the United States for the use of its Coast Guard Fleet and in its Veteran's Hospital. The Oil Company did not pay taxes on such sales, and the state brought suit. The Oil Company defended on the ground, among others, that if the statutes were construed as imposing a tax upon the sales made to the United States, such statutes were repugnant to the Federal Constitution. The state supreme court held "the exaction a valid privilege tax measured by the number of gallons sold" (277 U. S. 221, 72 L. ed. 858, 48 S. Ct. 451, 53 A.L.R. 583); that if it were a property tax, it was "imposed upon the gasoline while it is the property of the dealer" (147 Miss. 670–671, 112 So. 585); and that in either case the tax was not imposed upon, or against, an instrumentality of the Federal Government. 147 Miss. 671, 112 So. 585.

The Supreme Court of the United States reversed the judgment of the supreme court of Mississippi and held that the state was not entitled to collect the tax from the Panhandle Oil Company upon the gasoline sold by it to the Federal Government. In its opinion in that case, the Court said:

"The right of the United States to make such purchases is derived from the Constitution. The petitioner's right to make sales to the

United States was not given by the state and does not depend on state laws; it results from the authority of the National Government under the Constitution to choose its own means and sources of supply. While Mississippi may impose charges upon petitioner for the privilege of carrying on trade that is subject to the power of the state, it may not lay any tax upon transactions by which the United States secures the things desired for its governmental purposes.

"The validity of the taxes claimed is to be determined by the practical effect of enforcement in respect of sales of the government. [Citations of authority.] A charge at the prescribed rate is made on account of every gallon acquired by the United States. It is immaterial that the seller and not the purchaser is required to report and make payment to the state. Sale and purchase constitute a transaction by which the tax is measured and on which the burden rests. The amount of money claimed by the state rises and falls precisely as does the quantity of gasoline so secured by the government. It depends immediately upon the number of gallons. The necessary operation of these enactments when so construed is directly to retard, impede and burden the exertion by the United States, of its constitutional powers to operate the fleet and hospital. [Citations of authority.] To use the number of gallons sold the United States as a measure of the privilege tax is in substance and legal effect to tax the sale. [Citations of authority.] And that is to tax the United States—to exact tribute on its transactions and apply the same to the support of the state.

"The exactions demanded from petitioner infringe its right to have the constitutional independence of the United States in respect of such purchases remain untrammeled. [Citations of authority.] Petitioner is not liable for the taxes claimed." 277 U. S. 222, 72 L. ed. 858, 859, 48 S. Ct. 451, 56 A.L.R. 583.

There are no material differences between the laws of this state under which the controversy here arose and the laws of Mississippi that were involved in Panhandle Oil Co. v. Mississippi. If what the Court said and held in that decision is still in full force and effect, and binding as an authority upon this court, it would, we think, be decisive here. If the tax involved in that case were unconstitutional it would seem to follow that the tax involved in this case is likewise unconsti-

tutional. We are of the view, however, that decisions of the Supreme Court of the United States made after the rendition of the decision in Panhandle Oil Co. v. Mississippi have so effectively removed the supports on which that decision was said to rest that the decision can no longer be said to be binding as an authority upon the courts of the states. It is true the decision has not been directly overruled; but subsequent decisions of the Supreme Court of the United States establish a rule so inconsistent with the holding in that case, that the decision, in effect, has been overruled. There is no magic in the word "overruled." When a court expressly overrules a decision upon which a later decision is predicated, it, of necessity, also overrules so much of the later decision as is predicated upon the decision that is overruled.

The decision of the Court in Panhandle Oil Co. v. Mississippi evoked vigorous dissent from four members of the court. While it has been cited in many cases and was followed and made the basis for the decision in Graves v. Texas Oil Co. 298 U. S. 393, 80 L. ed. 1236, 56 S. Ct. 818, it has been distinguished in many subsequent cases (Wheeler Lumber Bridge & Supply Co. v. United States, 281 U. S. 572, 579, 74 L. ed. 1047, 1051, 50 S. Ct. 419; Alward v. Johnson, 282 U. S. 509, 514, 75 L. ed. 496, 499, 51 S. Ct. 273, 75 A.L.R. 9; Liggett & M. Tobacco Co. v. United States, 299 U. S. 383, 81 L. ed. 294, 57 S. Ct. 239; James v. Dravo Contracting Co. 302 U. S. 134, 151, 152, 82 L. ed. 155, 167, 168, 58 S. Ct. 208, 114 A.L.R. 318), and, in James v. Dravo Contracting Co. supra, the court declared that it must be deemed limited to its particular facts. 302 U. S. 151, 82 L. ed. 167, 58 S. Ct. 208, 114 A.L.R. 318.

Among the decisions cited by the Court in Panhandle Oil Co. v. Mississippi, in support of its holding that the tax there involved operated as an unconstitutional burden upon, and interference with, the exercise of national power, are Dobbins v. Erie County, 16 Pet. (U. S.) 435, 10 L. ed. 1022, and Gillespie v. Oklahoma, 257 U. S. 501, 66 L. ed. 338, 42 S. Ct. 171. Particular attention was called to the strictness of this rule as emphasized in Gillespie v. Oklahoma, 257 U. S. 501, 66 L. ed. 338, 42 S. Ct. 171. In Gillespie v. Oklahoma, the court held that the doctrine of immunity inhibited a state from imposing a tax on the net income derived by a lessee from leases of restricted Indian

Lands made pursuant to congressional authority. In Helvering v. Mountain Producers Corp. 303 U. S. 376, 82 L. ed. 907, 58 S. Ct. 623, the court, after careful re-examination of the question, held the decision in Gillespie v. Oklahoma to be "out of harmony with correct principle" and declared Gillespie v. Oklahoma to be overruled. 303 U. S. 387, 82 L. ed. 914, 58 S. Ct. 623. The repudiation in Helvering v. Mountain Producers Corp. "of the doctrine that a tax on the income of the lessee derived from a lease of government owned or controlled land is forbidden interference with the activities of the government concerned" led to the re-examination by the court in Helvering v. Gerhardt, 304 U. S. 411, 82 L. ed. 1432, 58 S. Ct. 969, "of the theory underlying the asserted immunity from taxation by one government of salaries of employees of the other. It was there pointed out that the implied immunity of one government and its agencies from taxation by the other should, as a principle of constitutional construction, be narrowly restricted." Graves v. New York, 306 U. S. 466, 83 L. ed. 927, 59 S. Ct. 595, 120 A.L.R. 1466.

After such re-examination, and upon application of the controlling principles underlying the doctrine of immunity, the court in the Gerhardt case "held that the salaries of employees of the New York Port Authority, a state instrumentality created by New York and New Jersey, were not immune from Federal income tax, even though the Authority be regarded as not subject to Federal taxation." Graves v. New York, 303 U. S. 466, 83 L. ed. 927, 59 S. Ct. 595, 120 A.L.R. 1466. The Gerhardt case naturally led to a re-examination of the theory that stemmed from Dobbins v. Day, 16 Pet. (U. S.) 435, 10 L. ed. 1022, and Collector v. Day (Buffington v. Day) 11 Wall. (U. S.) 113, 20 L. ed. 122, that the immunity of the government and its instrumentalities from taxation extends to the salaries of their officers and employees; and in Graves v. New York, 303 U. S. 466, 83 L. ed. 927, 59 S. Ct. 595, 120 A.L.R. 1466, the court said that "the conclusion reached in the Gerhardt case that in terms of constitutional tax immunity a Federal income tax on the salary of an employee is not a prohibited burden on the employer makes it imperative that we consider anew the immunity here claimed for the salary of an employee of a Federal instrumentality," and the court held that "all the reasons for refusing to imply a constitutional prohibition of Federal income taxation of sal-

aries of state employees, stated at length in the Gerhardt case, are of equal force when immunity is claimed from state income tax on salaries paid by the national government or its agencies," and that, "Collector v. Day (Buffington v. Day) 11 Wall. (U. S.) 113, 20 L. ed. 122, and New York ex rel. Rogers v. Graves, 299 U. S. 401, 81 L. ed. 306, 57 S. Ct. 269, are overruled so far as they recognize an implied constitutional immunity from income taxation of the salaries of officers or employees of the national or a state government or their instrumentalities."

Mr. Justice Butler, author of the opinion in Panhandle Oil Co. v. Mississippi, wrote vigorous dissents in Helvering v. Mountain Producers Corp. in Helvering v. Gerhardt, and in Graves v. New York. In his dissenting opinion in Helvering v. Mountain Producers Corp. he stated that with Gillespie v. Oklahoma, there "necessarily" went "a long line of decisions of this and other courts," and characterized the result of the decision of the Court as constituting a "sweeping change of construction of the Constitution." 303 U. S. 390, 391, 82 L. ed. 916, 917, 58 S. Ct. 623. In his dissenting opinion in Helvering v. Gerhardt, he said: "In substance, as well as in the language used, the decision just announced substitutes for that doctrine (the doctrine of absolute immunity) the proposition that, although the Federal tax may increase cost of state governments, it may be imposed if it does not curtail functions essential to their existence. Expressly or sub silentio, it overrules a century of precedents." 304 U. S. 429, 430, 82 L. ed. 1442, 58 S. Ct. 969.

"The sweeping change of construction of the Constitution," and the application of the controlling principles, announced in the decisions that decreed such change, seem to us to leave no substantial basis for the rule announced in Panhandle Oil Co. v. Mississippi. It seems to us rather that that decision, in effect, has been overruled.

The Federal land banks were brought into being by "The Federal Farm Loan Act." The title of the Act indicates the primary purpose intended to be performed by the banks, namely, to make farm loans. The other purposes were largely, if not wholly, incidental to such primary purpose. In the very nature of things the operation of automobiles in this state by a Federal land bank can be only incidental to its

"activities, and a tax upon a dealer from whom the Bank purchases gasoline with which to operate its cars is remote and indirect.

The imposition of the tax is not an exercise or an attempt to exercise by the state of any power "by taxation or otherwise, to retard, impede, burden, or in any manner control the operation of" (4 Wheat. (U. S.) 429–437, 4 L. ed. 607–609) the Federal Farm Loan Act. If regard "be had to substance and effect," and "merely theoretical conceptions of interference with the functions of government" be laid aside "there is no sufficient ground for holding that the effect upon the government is other than indirect and remote." 303 U. S. 386, 387, 82 L. ed. 914, 915, 58 S. Ct. 623. The imposition of the tax upon a dealer for gasoline sold by him to a Federal land bank "neither precludes nor threatens unreasonably to obstruct any function essential to the continued existence" of the bank. Neither does it operate to control, hinder, or impede the bank in the performance of any service that it was established to perform for the government. If any of the burden of the tax that is imposed upon the dealer indirectly reaches the land bank that "is but a necessary incident to the coexistence within the same organized government of the two taxing sovereigns, and hence is a burden the existence of which the Constitution presupposes." 304 U. S. 424, 82 L. ed. 1439, 58 S. Ct. 969.

The judgment appealed from is affirmed.

NUESSLE, Ch. J., and BURR, J., and SWENSON and GRIMSON, Dist. JJ., concur.