

# THE ATTORNEY GENERAL
# OF TEXAS

### AUSTIN 11, TEXAS

GERALD C. MANN
~~XXXXXXXXXXXXX~~
ATTORNEY GENERAL

Honorable George H. Sheppard
Comptroller of Public Accounts
Austin, Texas

<u>Overruled in part</u>
<u>by O-4392</u>

Dear Sir:

Opinion No. 0-2317
Re: Is a Post Exchange, operated and
maintained for the convenience of
officers and enlisted men of the
Army engaged in war games in East
Texas and Louisiana, such an in-
strumentality  or agency of the
Federal government as to confer
immunity from the cigarette stamp
tax (Article 7047c-1, Vernon's
Annotated Civil Statutes) upon
either the sale in Texas of un-
stamped cigarettes to the Exchange
by licensed distributors in the
State, or the importation of un-
stamped cigarettes from other states
by said Post Exchange and the sale
of such cigarettes to Army personnel?

We have for attention and answer your letter of May 2,
1940, wherein you submit for the opinion of this Department
the two following questions and factual statement, which we
quote:

"We have been asked by several qualified
cigarette distributors whether or not they would
be liable for the tax on cigarettes if sold un-
stamped and delivered in their own trucks to a
post exchange, or one of its branches, which is
being operated in connection with the regular
United States Army maneuvers now taking place in
the vicinity of San Augustine, Texas. The cigar-
ette tax above referred to is levied under Chapter
241, Regular Session of the Forty-fourth Legislature
and amended by Senate Bill 247, Regular Session
of the Forty-fifth Legislature.

"The facts pertaining to the prospective
purchasers of unstamped cigarettes from the qual-
ified cigarette distributors are as follows:

"1.   All troops taking part in the maneuvers are members of the regular U. S. Army and not National Guard or State Militia troops.

"2.   The Post Exchange and its branches, which operate exclusively for the benefit of the Regular U. S. Army troops, are not located on property over which jurisdiction has been ceded to the United States government by the State of Texas.

"3.   The buildings used by the Post Exchange for warehouses, storeroom and office are rented from local interest and not owned or constructed by the United States government.  The rent for all such buildings is paid out of Post Exchange funds.

"4.   The capital for stocking and paying the expenses of operation of the Post Exchange and its branches is raised by the sale of shares to various companies for which it is operated.  The companies pay for these shares out of surplus funds accumulated from unused appropriations by Congress for company mess purposes.

"5.   The Post Exchange and its branches are operated by Army personnel and supervised by officers of the Regular Army.

"6.   All books and records, pertaining to the receipts and disbursements and general operations of the Post Exchange, are audited by Army auditors.

"7.   All bills for merchandise, purchased by either the Post Exchange or its branches, must be submitted to the officer in charge of the Post Exchange for payment.

"8.   Any profit made from the operation of the Post Exchange is divided among the companies according to the number of shares held by each company.

This profit is deposited to the Company fund and may be expended for entertainment or other things beneficial which may be thought advisable by the Company Commander.

"9.   The Post Exchange does not sell cigarettes to the general public.

"Will you please advise me of your opinion in regard to the following questions:

"(a) Would a Texas cigarette 'distributor' be liable for the tax on unstamped cigarettes sold and delivered by him to a Regular Army Post Exchange or its branches, when operated in the manner and under the conditions as above described?

"(b) Is a Post Exchange, when operated in the manner above described, a cigarette distributor, as defined by Subsection 'm' of Section 1 of Article 7047c-1, Vernon's Annotated Civil Statutes, and liable for the tax on the 'first sale' in this State of cigarettes imported from other States, as levied by Section 2 of the above mentioned Article?"

Under the authorities, as we read them, the right of a state to levy and collect various excise taxes upon the sale or use of commodities by and through Post Exchanges operated in connection with the Army of the United States, turns upon either of two grounds or theories: (1) the absence of constitutional and legislative jurisdiction over the territory within which the sale or use of the commodity sought to be taxed is consummated or occurs, and (2) the immunity, under the Constitution of the United States, of the Federal government, or any of its departments, agents, or instrumentalities, created to discharge the constitutional functions of government, from taxation at the hands of the State under its revenue powers.

The first theory of tax immunity is removed from this case, because it is made to appear from your letter that the Post Exchanges involved are not located within the confines of a military reservation or other territory over which exclusive constitutional and legislative jurisdiction has been ceded by the Chief Executive of Texas to the United States, so as to remove sales consummated within such territory from the State's taxing power, under the authority of Standard Oil Co. of California vs. California, 291 U. S. 242; 54 Sup. Ct. 381; 78 Ed. 775.

The single issue for our determination in the instant case, and the one upon which turns the answer to both questions submitted by you, is whether or not Post Exchanges, organized, maintained and operated, under the facts and circumstances outlined, at various points in Texas subject to the political and legislative jurisdiction of the State, are departments, agencies or instrumentalities of the Federal government, so as to allow the purchase by them tax free, of cigarettes from licensed dealers in Texas, or the importation of such unstamped cigarettes from outside the State, and the sale or use of such cigarettes without the affixing of the State revenue stamps.

For the historical background and development of a Post Exchange as constituted under modern conditions, the language of the court in the case of Keane vs. United States, 272 Fed. 577, is enlightening:

"We have no definite information at hand as to how or when the first post exchange known in modern parlance was established; but it can safely be said that such a post exchange as we are now discussing is a descendant of the old sutler's camp. The dictionary tells us that a sutler was or is a small trader, who follows an army, and who is licensed to sell goods, especially edibles, to the soldiers. In other words, the post exchange is nothing more nor less than a stationary soldiers' co-operative sutler's camp or store. When troops are in active warfare and constantly on the march, manifestly a post exchange could not be maintained, and under such circumstances the sutler plies his trade, being authorized to do so by the commanding officer; but where soldiers are stationed for considerable periods of time at a post, then it becomes feasible for them to do away with the inconvenience of trading with a poorly equipped sutler, and with the necessity of paying him profits on his sales, and, instead, to establish for their own convenience and pleasure the soldiers' modern private store or exchange."

That Post Exchanges are a convenient and useful part of Army life, in ministering to such daily requirements of Army personnel as the Government has not deemed necessary to provide, cannot be gainsaid, and this fact finds recognition in the special Post Exchange regulations issued by the War Department, and by appropriations by Congress for the construction and equipment of suitable buildings for the purpose. But the authorities, although taking cognizance of these facts, have, with the exception of one hereinafter discussed, uniformly held that Post Exchanges were not thereby made agencies or instrumentalities of the Federal government.

Although not involving a tax question, but rather a question of whether or not funds realized from a Post Exchange belonged to the United States so that an indictment would lie for defrauding in connection therewith, we consider the case of Keane vs. United States, supra, to be highly persuasive, in holding that the prosecution would fail because a Post Exchange was not a department of the government and the United States was not responsible for its contracts and obligations and had no interest in its funds, although its business was

conducted by an officer detailed for the purpose.  We quote
copiously from this opinion because the modus operandi of the
Post Exchange involved therein closely parallels the ones in
the instant case:

"Nowhere in this pamphlet of special reg-
ulations is it required or commanded that post
exchanges shall be established.  Indeed, it is
expressly stated in these Special Regulations
that these exchanges are voluntary organizations
among the soldiers themselves.  As best we can
gather from these regulations, a post exchange
is a voluntary, unincorporated co-operative store
at, near, or on a military post; the Secretary of
War giving the soldiers at such post a license or
privilege to form such a co-operative store.  The
Secretary of War, in effect, says, in these reg-
ulations, to the soldiers, that while they are
not required to establish post exchanges, yet, if
they do establish them, that they should have for
their purpose the supplying to the troops at rea-
sonable prices of the articles of ordinary use,
wear, and consumption, not supplied by the govern-
ment, and to afford them means of rational recre-
ation and amusement, and through exchange profits
to provide, when necessary, the means for improv-
ing the messes.  The regulations suggest that an
assessment should be made upon the several organ-
izations contributing to the exchange for the
purpose of procuring necessary articles, and that
all articles thus procured must be paid for by the
first profits of the institution; it being dis-
tinctly understood that the officers incurring debts
on behalf of the exchange, and not the government,
are responsible for the payment thereof.

"Members of the exchange must be organizations,
companies, detachments, and individual enlisted men
cannot become members, unless three or more of them
are associated in a mess.  The special management
of the exchange is conducted by an officer desig-
nated and detailed by the commanding officer, and
this officer is responsible for the management of
the exchange, and is regarded as the custodian of
the funds belonging to it.  When the exchange is
free from debt, at the end of each quarter, a sum
sufficient to cover anticipated debts is set aside
as a reserve fund, and a percentage of the remainder
is distributed among the members, and other parts
thereof are set aside for specific purposes, and the

remainder may be divided among the organizations contributing to the exchange on an equitable basis; and a division of the cash resources of the exchange is made whenever the troops belonging to the exchange, or any part of them, change their station, and when all the units composing membership in an exchange have gone away or removed from the post, the exchange stock must be reduced to the lowest extent possible and converted into cash; and prior to the departure of the troops the property of the exchange is sold and the proceeds, together with the cash, are distributed among the organizations according to the number of shares held by each. Post exchange funds, when deposited in a bank, must be placed under their official designations,and not to the credit of the officer who is their custodian, and such funds of a post exchange are especially declared to be not public moneys within the meaning of sections 5488, 5499, and 5492 of the Revised Statutes (Comp. St. ¶ ¶ 10255, 10302, 10259), and misapplication of such funds by an officer having their custody is punishable, not under the general law, but under the Articles of War. Nowhere in these regulations do we find a rule or even a suggestion that under any possible contingency does or would the government ever receive or come into possession of any of the funds or assets of the exchange."

Bearing more specifically upon the taxability by a state of a commodity sold to a post exchange of a United States Army, we cite the case of People vs. Standard Oil Co. of California, 22 Pac. (2d) 2, and quote therefrom the following conclusive language:

"It is next urged that a sale to the army post exchange is a sale to a department of the government of the United States for official use of said government. Manifestly these sales are neither to a 'department' of the government nor for official use. The gasoline was sold to the exchange for resale to certain classes of persons for their private consumption. We have no hesitation in concluding that the legislative intent was to include the sales in question in computing the tax. But these observations do not determine the cause.

"We are pointed to the decision of the Supreme Court of the United States in the case of Panhandle Oil Co. v. Mississippi, 277 U. S. 218, 48 S. Ct. 451,

452, 72 L. Ed. 857, 56 A. L. R. 583, where the court
used language showing that an important question
is here involved.  There, as here, the state of Mis-
sissippi imposed an excise tax upon distributors of
gasoline measured by sales within that state.  The
state sued the oil company to recover balances
represented by sales to the United States for use
of its Coast Guard service operating in the Gulf
of Mexico and for its veterans' hospital at Gulf-
port.  The sales were made directly to the govern-
ment, and the court held that said statute was in-
operative as to them, using language in part as
follows:  'The states may not burden or interfere
with the exertion of national power or make it a
source of revenue or take the funds raised or tax
the means used for the performance of federal func-
tions. * * * The amount of money claimed by the
State rises and falls precisely as does the quan-
tity of gasoline so secured by the government.  It
depends immediately upon the number of gallons.
The necessary operation of these enactments when
so construed is directly to retard, impede, and
burden the exertion by the United States of its
constitutional powers to operate the fleet and
hospital. * * *'  This was a five-four decision
of the court; Justices Holmes, Brandeis, McReynolds,
and Stone dissented, Justices Holmes and McRey-
nolds writing opinions.

"But it seems to us that a well-founded dis-
tinction may be found between the sales there
involved and sales to an army post exchange.  The
commanding officer of an army post is not required
to organize the post exchange unless there is need
for it or unless the units present desire to par-
ticipate therein or unless the personnel is suf-
ficient to profitably maintain and support such an
institution.  In other words, a post exchange is at
most but a government agency, designed to operate
for the welfare of the troops such activities as a
general store, meat or vegetable market or gasoline
station, or a restaurant, gymnasium, recreation
room, library, or theater.  Thus it is not properly
described by the word 'department' of the govern-
ment in its activities.  It is largely a co-opera-
tive institution, intended to supply the needs and
promote the moral and civic betterment of the troops
at the post.

"It is supervised by an exchange council, com-

posed of the commanding officers of the respective
units represented in the organization. The funds
of the exchange are not public moneys within the
meaning of the Revised Statutes of the United States
(Rev. Stats. ∥ 5488, 5490, 5492 (18 USCA ∥ 173,
175, 177)). The exchange is not instituted by the
aid of funds from the United States nor are its
avails paid into the treasury. It is a voluntary,
unincorporated, co-operative association in which
all units share the benefits and all assume a posi-
tion analogous to that of partners. In the event
of the inability of the post exchange to pay its
debts, the organizations which participate in it
are supposed themselves to pay off all such obli-
gations in proportion to their respective interests
in the exchange. Neither the government nor the
officers of the post wherein the exchange is located
are liable for its debts. The property of the post
exchange is not to be treated as property belong-
ing to the United States. The exchange itself is
liable for certain federal taxes, such as the stamp
tax imposed by the Internal Revenue Act, the freight
tax imposed by the War Revenue Act of 1917 (40 Stat.
300), a floor tax on tobacco under the Revenue Act
of 1918, ∥ 702 (40 Stat. 1118); sales of ice
cream and soft drinks by a post exchange are sub-
ject to tax under the same act. From these and
other observations that might be made, touching
the nature of the organization of an army post ex-
change, we are of the opinion that it is an organ-
ization largely engaged in business of a private nature
and that sales to it should not be beyond the reach of
the taxing power of the state wherein it is located
and that it is not one of those agencies through
which the federal government directly exercises its
constitutional or sovereign power."

Although the judgment of the Supreme Court of Califor-
nia in the above case was reversed by the Supreme Court of
the United States in the case of Standard Oil Co. of Califor-
nia vs. California, cited at the outset of this opinion, such
reversal was not upon the point of law now under discussion,
but rather upon a question of territorial jurisdiction. Con-
sequently, the discussion of the court, above quoted, is not
in anywise discounted thereby.

The case of Pan-American Petroleum Corp. vs. State of
Alabama, 67 Fed. (2d) 590, likewise upholds the right of a
state to tax the sale of a commodity, even though the tax is
passed on to the Post Exchange of the regular Army, as the

purchaser thereof.  In this  connection, the court said:

"....Furthermore, a post exchange is, of
course, not the government; nor is it a depart-
ment or instrumentality thereof.  On the con-
trary, a post exchange is a voluntary, unincor-
porated, co-operative association of army or-
ganizations in which all share as partners in
the profits and losses.  The government has no
share in the profits, and is not bound by the
losses.  We are therefore of the opinion that
sales made by appellant to the post exchanges
at Camp McClellan and Maxwell Field are not ex-
empt from the state excise taxes.  People v.
Standard Oil Co. (Cal. Sup.) 22 P. (2d) 2."

The case of United States vs. Query et al., 21 Fed.
Sup. 784, stands alone in opposition to the principle of law
announced in the above discussed cases.  On an injunction
brought by the United States to enjoin the South Carolina
Tax Commission from enforcing certain provisions of its
revenue statutes, the court held that a Civilian Conservation
Corps Post Exchange, established pursuant to statutory auth-
ority and operated for the welfare of the camp's enrollees,
is a Federal instrumentality not subject to the license tax
imposed by State statute on the privilege of selling certain
articles, and not subject to the supervisory authority of the
State Tax Commission.  Title 16, USCA, Section 584p, appro-
priates money out of the Federal Treasury "to pay any expense
in connection with the conduct, operation or management of
any camp exchange" established and operated in accordance
with regulations prescribed by the Director.  The court, in
its opinion, seizes upon this recognition by Congress and the
utilization of Federal funds to pay current operating expenses
of the camp exchange, as stamping such exchanges with the
character of Federal agencies or instrumentalities, protected,
under general principles of constitutional law, from State
taxation.  Under the facts before us, it does not appear that
funds from the Federal Treasury are used to defray operating
expenses, nor have we found an act of Congress authorizing
any appropriation except for the construction of the build-
ings which house such exchanges.  This point of difference
may serve to reconcile the apparent conflict between these
authorities, but if not, we are not inclined to follow this
decision of a Federal district court against the three well
considered decisions of appellate courts, both State and
Federal, which, to our mind, have announced the better rule
of law.

But even conceding that we have incorrectly interpreted

the decisions of our courts to hold that a Post Exchange, organized and maintained in connection with the regular Army, is not an agency or instrumentality of the Federal government in the constitutional sense, it would nevertheless be our opinion that the excise stamp tax levied upon the sale of cigarettes to or by a Post Exchange for the personal use of officers and men of the regular Army, would not be a burden upon a Federal function, obnoxious to the Federal Constitution.

Prior to our examination of the recent trend of decisions of the Supreme Court of the United States, and inferior Federal and State tribunals, we would have said that this question was conclusively foreclosed by the decision of the Supreme Court of the United States in the case of Panhandle Oil Co. vs. State of Mississippi, 277 U. S. 218; 48 Sup. Ct. 451; 72 L. Ed. 857. This case involved the constitutionality of an attempted levy and collection by a state of an excise tax from a local distributor of motor fuel, upon motor fuels sold by such distributor directly to the Navy for use in certain boats belonging to the United States Navy. The contention was made in this case that the tax was levied as an occupation tax upon the local dealer or distributor, measured by the gallonage sold, and the mere fact that such dealer or distributor, as a business practice, passed such tax on to the consumer, who in this instance chanced to be the United States government, would not render such tax unconstitutional as a direct burden upon a Federal instrumentality. Although this contention was rejected by the Supreme Court, a vigorous dissent was entered by Mr. Justice Holmes, who pointed out that, carried to its ultimate conclusion, such principle of law would result in employees of the various departments and bureaus of the Federal government being allowed to purchase clothes and various other articles and commodities upon which the various states had levied sales taxes, merely by virtue of the fact that such tax was passed on to the consumer as part of the cost of the product.

This dissenting opinion of Mr. Justice Holmes was vindicated when the Supreme Court, in the case of James vs. Dravo Contracting Co., 302 U. S. 134; 82 L. Ed. 155, limited its own decision in the Panhandle case discussed above, by holding that an occupation tax measured by gross income is not invalid when imposed by a State upon a contractor with the United States as laying a direct burden on the Federal government, even though the imposition of the tax may increase the cost to the government of the work contracted to be done. Although not expressly overruled, the Supreme Court in this case expressly mentioned the decision in the case of Panhandle Oil Co. vs. Mississippi, supra, and stated that it and similar

cases had been distinguished and limited to their particular facts.

Federal Land Bank of St. Paul vs. D. E. Ochford, 287 N.W. 522, cites and follows the authority of James vs. Dravo Contracting Co., supra, and numerous other decisions of the Supreme Court of the United States, modifying the principle of Federal immunity established in the Panhandle case, and holds that a Federal Land Bank, although admittedly an instrument or agency of the Federal government, was yet subject to an excise tax levied by a state upon the sale to it of motor fuel.

Like the motor fuel tax in the case last cited and the occupation tax measured by gross income upon the contractor in the leading case of James vs. Dravo Contracting Co., supra, the cigarette tax levy involved in the instant question is an excise tax levied upon the sale or use of cigarettes by licensed distributors in Texas. This tax is not levied upon Post Exchanges of the Army, as such, and the fact that such tax is passed on to such Post Exchanges by licensed distributors in Texas as part of the purchase price, constitutes too remote a burden to render such a tax unconstitutional as a tax upon an agency or an instrumentality of the Federal government, under the recent trend of authorities modifying if not indirectly overruling the much-discussed and much-criticised principle of Federal tax immunity announced in the case of Panhandle Oil Co. vs. State of Mississippi, supra.

Even agencies and instrumentalities of the Federal government may engage in practices and functions outside the protection of the Constitution and thereby become subject to the laws of a state regulating or taxing such extragovernmental function. The sale of cigarettes for the personal use and convenience of officers and men of the Army falls within this classification and should be subject to the excise tax levied thereon by the State of Texas. The point we stress is that for a Federal agency or instrumentality to be immune from State taxation, its activities and functions must be in furtherance of the constitutional powers of the Federal government. We can find no rational relationship between smoking cigarettes by officers and men, insofar as the constitutional functions and purposes of the government is concerned, and the proper functioning of the Army. To hold otherwise would be to extend the tax immunity to smokers of cigarettes in the postal service and in the various other departments of the Federal government. Authorities supporting our position here, that Federal agencies or instrumentalities which also engage in extragovernmental functions may not invoke Federal immunity from taxation unless the Federal functions are un-

duly burdened, are Educational Films Corporation of America vs. Ward, 51 Sup. Ct. 170; 282 U. S. 379; Santa Clara Co. vs. Southern Pacific Ry., 18 Fed. 385, aff. 118 U. S. 394; Alward vs. Johnson, 282 U. S. 509; 51 Sup. Ct. 273; 75 L. Ed. 496; Willcuts vs. Bunn, 282 U. S. 216; 51 Sup. Ct. 125; 75 L. Ed. 304; Tirrell bs. Johnston, 171 Atl. 641.

We answer both questions submitted in the affirmative. Licensed cigarette distributors in Texas may not lawfully sell unstamped cigarettes to regular Army Post Exchanges or branches, operated in the mode and manner outlined, nor may such exchanges resort to the expediency of importing cigarettes to escape the tax collectible on intra-state sales, because they in turn would become "distributors" and liable for the tax accruing on a "first sale" as defined by the Cigarette Tax Law of Texas.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By s/Pat M. Neff, Jr.
    Pat M. Neff, Jr.
    Assistant

PMN/oe/wc

APPROVED MAY 7, 1940
s/Gerald C. Mann
ATTORNEY GENERAL OF TEXAS

Approved Opinion Committee By s/BWB Chairman