KEIFER & KEIFER *v.* RECONSTRUCTION FINANCE CORP. AND REGIONAL AGRICULTURAL CREDIT CORP.

No. 364. Argued January 31, 1939, February 1, 1939.—Decided February 27, 1939.

*Mr. Ernest B. Perry,* with whom *Mr. Robert Van Pelt* was on the brief, for petitioner.

*Mr. Peyton R. Evans,* with whom *Solicitor General Jackson, Assistant Attorney General Whitaker,* and *Messrs. Paul A. Sweeney, Edward J. Ennis,* and *Arthur C. Bernard* and *May T. Bigelow* were on the brief, for respondents.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The Court took this case for review because an important question of federal law called for settlement, particularly in view of a conflict between the court below and the Supreme Court of Minnesota. *Casper* v. *Regional Agricultural Credit Corp.*, 202 Minn. 433; 278 N. W. 896. The question is whether a Regional Agricultural Credit Corporation, in the circumstances presently to be stated, is immune from suit.

On July 21, 1932, Congress enlarged the powers of the Reconstruction Finance Corporation (hereafter called "Reconstruction") established early that year, Act of January 22, 1932, c. 8, 47 Stat. 5, by authorizing it, among other things, to create regional agricultural credit corporations "in any of the twelve Federal land-bank districts." Emergency Relief and Construction Act of 1932, § 201 (e), c. 520, 47 Stat. 709, 713. Each corporation was to have a paid-up capital of not less than $3,000,000 to be subscribed for by Reconstruction, was to be managed by appointees of Reconstruction, and was empowered to make loans to farmers and stockmen for agricultural purposes or for raising and marketing livestock. Accordingly, on September 10, 1932, Reconstruction chartered the Regional Agricultural Credit Corporation of Sioux City, Iowa (hereafter called "Regional"). Regional, in due exercise of its powers, entered into so-called cattle-feeding contracts, whereby it undertook to provide sufficient feed and water for livestock with appropriate security for rendering these services. Failure through negligence to provide proper care for cattle delivered under this arrangement, with resulting damage to the livestock, is the basis of this suit brought by petitioner, plaintiff below, against Reconstruction and Regional. Both de-

fendants demurred on several grounds, of which challenge
to the jurisdiction of the court is alone pertinent here.
The District Court sustained the demurrers and dis-
missed the suit. 22 F. Supp. 918. The Court of Ap-
peals affirmed, holding for Reconstruction because its
control of Regional had been transferred by Executive
Order (No. 6084, dated March 27, 1933, effective May
27, 1933) to the Farm Credit Administration prior to the
alleged cause of action, and for Regional because it was
found immune from suit. 97 F. 2d 812. Certiorari was
granted, directed solely to the latter issue. 305 U. S.
588.

The starting point of inquiry is the immunity from
unconsented suit of the government itself. As to the
states, legal irresponsibility was written into the Eleventh
Amendment; as to the United States, it is derived by
implication. *Monaco* v. *Mississippi,* 292 U. S. 313, 321.
For present purposes it is academic to consider whether
this exceptional freedom from legal responsibility rests
on the theory that the United States is deemed the in-
stitutional descendant of the Crown, enjoying its immu-
nity but not its historic prerogatives, cf. *Langford* v.
*United States,* 101 U. S. 341, 343, or on a metaphysical
doctrine "that there can be no legal right as against the
authority that makes the law on which the right de-
pends." *Kawananakoa* v. *Polyblank,* 205 U. S. 349, 353.
But because the doctrine gives the government a privi-
leged position, it has been appropriately confined.[1]

Therefore, the government does not become the con-
duit of its immunity in suits against its agents or instru-
mentalities merely because they do its work. *United
States* v. *Lee,* 106 U. S. 196, 213, 221; *Sloan Shipyards*

[1] See Professor Borchard's bibliography in (1934) 20 A. B. A. J.
747, 748, and the collection of authorities in Judge Mack's opinion in
*The Pesaro,* 277 F. 473, rev'd, 271 U. S. 562.

v. *U. S. Fleet Corp.*, 258 U. S. 549, 567. For more than
a hundred years corporations have been used as agencies
for doing work of the government. Congress may cre-
ate them "as appropriate means of executing the powers
of government, as, for instance, . . . a railroad corpo-
ration for the purpose of promoting commerce among the
States." *Luxton* v. *North River Bridge Co.*, 153 U. S.
525, 529. But this would not confer on such corpora-
tions legal immunity even if the conventional to-sue-
and-be-sued clause were omitted. In the context of
modern thought and practice regarding the use of cor-
porate facilities, such a clause is not a ritualistic formula
which alone can engender liability like unto indispensable
words of early common law, such as *"warrantizo"* or "to
A and his heirs," for which there were no substitutes and
without which desired legal consequences could not be
wrought. Littleton, Tenures (Wambaugh ed.) §§ 1, 733.

Congress may, of course, endow a governmental cor-
poration with the government's immunity. But always
the question is: has it done so? *Federal Land Bank* v.
*Priddy*, 295 U. S. 229, 231. Cf. *Helvering* v. *Gerhardt*,
304 U. S. 405, 411–412n. This is our present problem.
Has Congress endowed Regional with immunity in the
circumstances which enveloped its creation? It is not
a textual problem; for Congress has not expressed its
will in words. Congress may not even have had any con-
sciousness of intention. The Congressional will must
be divined, and by a process of interpretation which, in
effect, is the ascertainment of policy immanent not
merely in the single statute from which flow the rights
and responsibilities of Regional, but in a series of stat-
utes utilizing corporations for governmental purposes
and drawing significance from dominant contemporane-
ous opinion regarding the immunity of governmental
agencies from suit.

Because of the advantages enjoyed by the corporate device compared with conventional executive agencies, the exigencies of war and the enlarged scope of government in economic affairs have greatly extended the use of independent corporate facilities for governmental ends.[2] In spawning these corporations during the past two decades, Congress has uniformly included amenability to law. Congress has provided for not less than forty of such corporations discharging governmental functions, and without exception the authority to-sue-and-be-sued was included.[3] Such a firm practice is partly

[2] See Thurston, Government Proprietary Corporations; Van Dorn, Government Owned Corporations; McDiarmid, Government Corporations and Federal Funds; Field, *Government Corporations: A Proposal* (1935) 48 Harv. L. Rev. 775; McIntyre, *Government Corporations as Administrative Agencies: An Approach* (1936) 4 Geo. Wash. L. Rev. 161.

[3] The American Legion, 41 Stat. 284, 285; Foreign Banking Corporations, 41 Stat. 378, 379; China Trade Act Corporation, 42 Stat. 849, 851; Belleau Wood Memorial Association, 42 Stat. 1441; Federal Intermediate Credit Banks, 42 Stat. 1454, 1455; National Agricultural Credit Corporations, 42 Stat. 1454, 1462; The Grand Army of the Republic, 43 Stat. 358, 359; Inland Waterways Corporation, 43 Stat. 360, 362; The United States Blind Veterans of the World War, 43 Stat. 535, 536; American War Mothers, 43 Stat. 966, 967; Textile Foundation, 46 Stat. 539, 540; Reconstruction Finance Corporation, 47 Stat. 5, 6; Disabled American Veterans of the World War, 47 Stat. 320, 321; Federal Home Loan Bank, 47 Stat. 725, 735; Tennessee Valley Authority, 48 Stat. 58, 60; Corporation of Foreign Security Holders, 48 Stat. 92, 93; Home Owners' Loan Corporation, 48 Stat. 128, 129; Federal Deposit Insurance Corporation, 48 Stat. 162, 172; Production Credit Corporations, Production Credit Associations, Central Bank for Coöperatives, Regional Banks for Coöperatives, 48 Stat. 257, 266; Federal Farm Mortgage Corporations, 48 Stat. 344, 345; Cairo Bridge Commission, 48 Stat. 577, 581; Port Arthur Bridge Commission, 48 Stat. 1008, 1009; Federal Credit Union, 48 Stat. 1216, 1218; Federal Savings & Loan Insurance Corporation, 48 Stat. 1246, 1256; National Mortgage Associations, 48 Stat. 1246, 1253; American National Theater and Academy, 49 Stat.

an indication of the present climate of opinion which has brought governmental immunity from suit into disfavor, partly it reveals a definite attitude on the part of Congress which should be given hospitable scope.[4] It is noteworthy that the oldest surviving government corporation—the Smithsonian Institution—has several times been in the law courts, even in the absence of explicit authority and although the general feeling regard-

457, 458; Federal Housing Administrator, 49 Stat. 684, 722; Veterans of Foreign Wars of the United States, 49 Stat. 1390, 1391; Disaster Loan Corporation, 50 Stat. 19; Farmers' Home Corporation, 50 Stat. 527; Marine Corps League, 50 Stat. 558, 559; Owensboro Bridge Commission, 50 Stat. 641, 645; Southeastern University, 50 Stat. 697, 698; American Chemical Society, 50 Stat. 798, 799, 800 (semble).; United States Housing Authority, 50 Stat. 888, 889, 890; Federal Crop Insurance Corporation, 52 Stat. 72, 73; Niagara Falls Bridge Commission, 52 Stat. 767, 770.

This list does not include, of course, the government corporations chartered under general state or District of Columbia incorporation laws. *Sloan Shipyards* v. *U. S. Fleet Corp., supra.*

[4] Mr. Justice Holmes, on Circuit, gave pioneer expression to inferences to be drawn from legislative policy. "A statute," he wrote in *Johnson* v. *United States*, 163 F. 30, 32 (C. C. A. 1st), "may indicate or require as its justification a change in the policy of the law, although it expresses that change only in the specific cases most likely to occur to the mind. The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed. The major premise of the conclusion expressed in a statute, the change of policy that induces the enactment, may not be set out in terms, but it is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before." See also, Taft, C. J., in *United Mine Workers* v. *Coronado Coal Co.*, 259 U. S. 344, 385–389; Sutherland, J., in *Funk* v. *United States*, 290 U. S. 371, 381; Cardozo, J., in *Van Beeck* v. *Sabine Towing Co.*, 300 U. S. 342, 350–351; Lord Birkenhead, L. C., in *Bourne* v. *Keane* [1919] A. C. 815, 830; Stone, *The Common Law in the United States* (1936) 50 Harv. L. Rev. 4, 13; Landis, *Statutes and the Sources of Law*, Harvard Legal Essays, p. 213.

ing governmental immunity was very different in 1846 from what it has become in our own day. 9 Stat. 102. *Smithsonian Institute* v. *Meech,* 169 U. S. 398; *Smithsonian Institute* v. *St. John,* 214 U. S. 19.

Only two instances have been brought to the Court's attention in which Congress has not explicitly rendered its recent corporate creations amenable to suit. These are the Regionals and the Federal Savings and Loan Associations. 48 Stat. 128, 132–134. It is significant that neither of these classes of corporations was the direct emanation of Congress or the offspring of a general incorporation law under Congressional authority. *Sloan Shipyards* v. *U. S. Fleet Corp., supra.* Each was to come into being through an organ that had theretofore been created by Congress. We put the Federal Savings and Loan Associations to one side, because they are not now before the Court.[5] But the circumstances attending the origination of Regional make it manifest that it was within the considerations that have uniformly led Congress to make its immediate corporate creatures subject to suit. The genesis, functions, and affiliations of Regional all negative the assumption that in its operations it was to be without the law.

Reconstruction is the parent of Regional. When creating it, Congress gave Reconstruction various general corporate powers including authority "to sue and be sued, to complain and to defend, in any court of competent jurisdiction, State or Federal." 47 Stat. 5, 6. When later Congress authorized Reconstruction to create these Regional Agricultural Credit Corporations, it did so by

---

[5] It is to be noted that the progenitor of these Associations—the Federal Home Loan Bank Board—is not itself a corporation. But see *Sloan Shipyards* v. *U. S. Fleet Corp., supra,* in which the Fleet Corporation was found subject to suit although Congress authorized its creation through the President.

outlining in a single section of a comprehensive statute the broad scope of this added power for Reconstruction. 47 Stat. 709, 713.[6] Congress naturally assumed that the general corporate powers to which it had given particularity in the original statute establishing Reconstruction would flow automatically to the Regionals from the source of their being. Such, certainly, has been the practical construction of the Regional Agricultural Credit Corporations in the instinctive pursuit of their enterprise. See, e. g., *Hallenbeck* v. *Regional Agricultural Credit Corp.*, 47 Ariz. 477; 56 P. 2d 1041; *Regional Agricultural Credit Corp.* v. *Elston, Prince & McDade*, 183 So. 91 (La.). Cf. *Lewis* v. *Regional Agricultural Credit Corp.*, 92 F. 2d 1008 (C. C. A. 10th). To imply for Regionals a unique legal position compared with those corporations to whose purposes Regional is so closely allied,[7] is to infer Congressional idiosyncrasy. There is a much more sensible explanation for the failure of Congress to bring Regional by express terms within its emphatic practice not to confer sovereign immunity upon these government corporations. Congress had a right to assume that the characteristic energies for corporate enterprise with which

---

[6] Section 201 (e) of the statute, providing for Regional Agricultural Credit Corporations, covers less than half a page of a fifteen-page statute.

[7] See, e. g., Federal Land Banks, 39 Stat. 360, 363; Joint Stock Land Banks, 39 Stat. 360, 374; Federal Intermediate Credit Banks, 42 Stat. 1454, 1455; National Agricultural Credit Corporations, 42 Stat. 1454, 1462; Production Credit Corporations, Production Credit Associations, Central Bank for Coöperatives, Regional Banks for Coöperatives, 48 Stat. 257, 266; Federal Farm Mortgage Corporations, 48 Stat. 344, 345; National Mortgage Associations, 48 Stat. 1246, 1253. Congress itself recognized the identity of purpose in these various corporations. 48 Stat. 267, 268. Note, too, that Production Credit Corporations, successors to Regional Agricultural Credit Corporations are subject to suit. 48 Stat. 257, 266.

a few months previously it had endowed Reconstruction would now radiate through Reconstruction to Regional.

To give Regional an immunity denied to more than two score corporations, each designed for a purpose of government not relevantly different from that which occasioned the creation of Regional, is to impute to Congress a desire for incoherence in a body of affiliated enactments and for drastic legal differentiation where policy justifies none. A fair judgment of the statute in its entire setting relieves us from making such an imputation of caprice.

The legal position of Regional is, therefore, the same as though Congress had expressly empowered it "to sue and be sued." The scope of this liability remains to be explored.

Regional claims immunity in any event because Congress has not subjected it to suit "in tort." It is assumed that the present action is not one upon a contract, express or implied, and, therefore, outside the purview of "to sue and be sued." The premise is not valid, nor does the conclusion follow.

The transaction which gave rise to the controversy was a bailment of livestock for hire, and the cause of action lack of reasonable diligence by the bailee. Ever since the fifteenth century, according to Maitland, there were "actions against bailees for negligence in the custody of goods entrusted to them, and here also it was necessary to allege an assumpsit"—the having undertaken to do something. Maitland, Equity, Lecture VI, pp. 362, 363; Maitland, The Forms of Action at Common Law, Lecture VI, pp. 68, 69. That Regional's failure properly to feed and water the livestock entrusted to it by the cattle-feeding contract was not a wrong disassociated from carrying out the very transaction which brought it into existence, is evident from the recognized liability of the United States itself as lessee and bailee even under the

explicit restrictions of the Court of Claims Acts.[8] Both this Court and the Court of Claims have sustained actions not dissimilar from the present. They have recognized that the breach of implied duty of a lessee "not to commit waste, or suffer it to be committed," *United States* v. *Bostwick*, 94 U. S. 53, 68, and of a bailee not to neglect "to exercise ordinary care and skill," *Gulf Transit Co.* v. *United States*, 43 Ct. Cl. 183, 199, are duties that have their source in contract even though the guilty agents may be merely tort-feasors. To be sure, the common law fiction of waiving the tort and suing in assumpsit cannot be used as an evasion of the limited liability created by the Court of Claims Acts. *Bigby* v. *United States*, 188 U. S. 400; *United States* v. *Minnesota Investment Co.*, 271 U. S. 212, 217. But where the wrong really derives from an undertaking, to stand on the undertaking and to disregard the tort is not to invoke a fictive agreement. It merely recognizes a choice of procedural vindications open to the injured party.

To assume that Congress in subjecting these recently created governmental corporations to suit meant to enmesh them in these procedural entanglements, would do violence to Congressional purpose. When it chose to do so, Congress knew well enough how to restrict its consent to suits sounding only in contract, even with all the controversies in recondite procedural learning that this might entail. It did so with increasing particularity in the successive Court of Claims Acts. 10 Stat. 612; 24 Stat. 505; 28 U. S. C. §§ 41 (20), 250 (1). In the light of these statutes it ought not to be assumed that when

---

[8] The Act of February 24, 1855 (10 Stat. 612), establishing the Court of Claims allowed suit for claims "upon any contract, express or implied . . ." The Act of March 3, 1887 (24 Stat. 505) allowed suits for claims "upon any contract, express or implied . . . or for damages, liquidated or unliquidated, in cases not sounding in tort. . . ." See 28 U. S. C. §§ 41 (20), 250 (1).

Congress consented "to suit" without qualification, the effect is the same as though it had written "in suits on contract, express or implied, in cases not sounding in tort." No such distinction was made by Congress, and no such interpolation into statutes has been made in cases affecting government corporations incorporated under state law or that of the District of Columbia.[9] There is equally no warrant for importing such a distinction here. To do so would make application of a steadily growing policy of governmental liability contingent upon irrelevant procedural factors. These, in our law, are still deeply rooted in historical accidents to which the expanding conceptions of public morality regarding governmental responsibility should not be subordinated.

Congress has embarked upon a generous policy of consent for suits against the government sounding in tort even where there is no element of contract. It has sanctioned suits for patent infringement, 36 Stat. 851, provided for compensation for the disability or death of a government employee "while in the performance of his duty," 39 Stat. 742, authorized payment for damage to property by the Army Air Service. 41 Stat. 109. These and other public statutes and many private bills were founded on considerations thus generalized in a Report of the Senate Committee on Claims:

"In other words, it may be said that Congress has recognized the general liability of the Government within maximum amounts for the negligence of officers and employees of the United States, but the machinery for determining that liability is defective and results in overburdening the Claims Committee of Congress and Congress itself with the consideration of tort liability claims and with injuries to the claimants.

[9] The cases are collected in Thurston, *Government Proprietary Corporations* (1935) 21 Va. L. Rev. 351, 378, *et seq.*

"This proposed legislation is designed to relieve the situation by utilizing the machinery of the Accounting Office and judicial branches of the Government in the assistance of Congress." Senate Report No. 1699, 70th Cong., 2d Sess., p. 4. See also Senate Report No. 658, 72d Cong., 1st Sess., p. 3.

Acting on these views, Congress passed a general court of claims bill, which, however, at the close of the session failed of enactment by President Coolidge's pocket-veto. H. R. 9285, 70th Cong., 2d Sess.; 70 Cong. Rec. 4836.[10] Congress has thus clearly manifested an attitude which serves as a guide to the scope of liability implicit in the general authority it has conferred on governmental corporations to sue and be sued. We should be denying the recent trend of Congressional policy to relieve Regional from liability. This compels us to reverse the judgment of the court below.

*Reversed.*

---

[10] That objections to the administrative features of the bill were the probable reasons for the veto is indicated by a memorandum of Attorney-General Sargent, for which see McGuire, *Tort Claims against the United States* (1931) 19 Geo. L. J. 133, 134, 135.