**RECONSTRUCTION FINANCE CORP. v. MacARTHUR MINING CO., Inc.**

No. 14121.

United States Court of Appeals Eighth Circuit.

Nov. 6, 1950.

Rehearing Denied Dec. 5, 1950.

George Arthur Fruit, Attorney, Department of Justice, Washington, D. C., (H. G. Morison, Assistant Attorney General, Sam M. Wear, United States Attorney, Earl A. Grimes, Assistant United States Attorney, Kansas City, Mo., and Joseph M.

Friedman, Special Assistant to the Attorney General, on the brief), for appellant.

Inghram D. Hook, Kansas City, Mo. (John W. Hoffman, Jr., Hook & Thomas, and Harry L. Thomas, all of Kansas City, Mo., on the brief), for appellee.

Before SANBORN and THOMAS, Circuit Judges, and DEWEY, District Judge.

THOMAS, Circuit Judge.

This proceeding is characterized by plaintiff in its. brief as a "suit * * * for breach of contract on the part of the Reconstruction Finance Corporation", defendant. The complaint is in two counts. The court denied recovery on count 2 and entered judgment against defendant for $296,681.77 on count 1, from which judgment the Reconstruction Finance Corporation appeals. D.C., 87 F.Supp. 211.

The complaint alleges that plaintiff MacArthur Mining Company, Inc., is a Kansas corporation; that defendant Reconstruction Corporation is a corporation organized by an Act of Congress; that Metals Reserve Company was during the years 1940–1944 a wholly owned subsidiary of Reconstruction Finance Corporation, and its agent to encourage the production of copper, lead and zinc, and its fiscal agent for the payment of money due the producers of lead and zinc; and that Metals Reserve Company was dissolved by Joint Resolution of Congress June 30, 1945, 59 Stat. 310, 15 U.S.C.A. § 611 note, and its assets and liabilities were transferred to the Reconstruction Finance Corporation.

The alleged contract for breach of which damages were claimed and awarded by the district court consists of a declaration of policy of the United States embodied in two letters, which, it is claimed, constituted an offer, and the acceptance of the terms thereof by plaintiff and full performance on its part.

The first letter, dated April 17, 1943, and addressed to the President of the United States, was written by Mr. Donald M. Nelson, chairman of the War Production Board. The letter recites that it is in response to a request of the President that he be provided with a complete review of the war metals and minerals program with suggestions as to policies to be followed with respect to supplying 1944 needs.

Under the heading, "Recommended general policies", paragraph 5 is relied upon. It reads: "5. It is national policy that labor, materials, transportation, and time to get into production, rather than money cost, are to be considered the controlling factors in deciding whether or not to increase production, but that the price paid shall bear a reasonable relation to the costs of production and the earning of a fair return over the costs of each separate producer."

The second letter relied upon was signed by the President, dated April 24, 1943, and addressed to Hon. James E. Murray, United States Senate, Washington, D. C. The letter reads: "This is in further reply to your letter of February 19, raising questions concerning our national policy with respect to the production of strategic and critical metals and minerals. Mr. Donald M. Nelson, Chairman of the War Production Board, has submitted the policies set forth in the letter attached with the recommendation that I approve them and make them public. I do approve these policies, and I am making them public in this letter to you."

The complaint alleges that this correspondence is a Presidential Directive having "the force and effect of law by reason of the War Time Powers granted to the President * * * by Act of Congress, 50 App., U.S.C.A. 601, 631."

It appears that plaintiff was in 1943 operating a mine located in the so-called Tri-State District of Missouri, Oklahoma and Kansas and producing lead and zinc; and it is alleged that " * * * in reliance upon this National policy which your Petitioner alleges to be a commitment to and contract with Petitioner that quotas and premiums would be established and paid which would result in a fair margin of profits, Petitioner continued its operations."

It was further alleged, and it is admitted, that on January 1, 1943, there was in existence a lawful executive order freezing the price of zinc at 8¼ cents per pound and the price of lead at 6½ cents per pound.

There was also in existence a lawfully constituted Premium Price Quota Committee consisting of representatives of the Office of Price Administration, and the War Production Board. It was the duty of this Committee, which had been created under § 2(e) of the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A. Appendix, § 902(e), to determine the premiums, or subsidies, to be paid to producers of lead and zinc over and above the ceiling price. The Act provided that "such subsidy payments to domestic producers * * * may be paid, only by corporations created or organized pursuant to such section 5d [of the Reconstruction Finance Corporation Act as amended]". In this case the payments so determined would be made by the Metals Reserve Company. Nothing in the pertinent statutes nor in the executive orders authorized or permitted the Metals Reserve Company to pay premiums or subsidies in excess of those authorized by the Price Quota Committee.

Plaintiff alleges that its "contract" was breached in that the Quota Committee refused to allow it reasonable and fair quotas during 1943 and 1944, "which would allow a fair margin of profit"; that such quotas were "not based upon fact but constituted a series of decisions and actions utterly unauthorized by law and inequitable in nature and which were the product of the unwarranted and capricious action of the members of the Committee and in direct violation of the Directive of the President of the United States and the law of the land." For which alleged breach of "contract" plaintiff demanded judgment for damages in the amount of $296,681.77 with interest and costs.

Plaintiff alleged further that no appellate procedure was provided for with respect to the decisions of the Quota Committee and that it was therefore powerless to appeal from the Committee's arbitrary action; that its claim was submitted to the Stabilization Administrator in December, 1945, and was the basis of an opinion by him with an order attached. In that opinion it was said "An examination of the file justifies the conclusion that Mr. Nelson's let-

ter of April 17, 1943, and the President's approval of it constitutes a commitment to MacArthur that quotas and premiums would be established which would result in a fair margin of profit." The opinion concluded " * * * it is respectfully suggested and recommended that the Quota Committee consider the quotas and premiums for the period prior to midyear 1944 and with the benefit of information now available covering that period finally fix such premium therefor which will be compensatory to the extent of the Executive Commitment."

It is further alleged that the Quota Committee continued "its arbitrary and capricious policy * * * although the Assistant Solicitor General of the United States had written an opinion" in a letter dated September 7, 1945, which had said that the Nelson letter of April 17, 1943, and the President's letter to Senator Murray of April 24, 1943, "must be considered as an authoritative statement of the policy of the Executive, to be applied by the executive agencies of the Government to the full extent of their legal powers."

In its answer the defendant denied the claims of plaintiff; admitted its corporate existence under an Act of Congress and of the Metals Reserve Company, the dissolution of the latter company, and the transfer of its assets and liabilities to defendant. It alleged further that the Premium Price Plan was administered by the War Production Board, the Office of Price Administration and the Metals Reserve Company; that the alleged decisions of the Quota Committee were recommendations which became effective only after approval of the War Production Board and the Office of Price Administration and their successor agencies. It is further alleged that after the receipt of the opinion of the Stabilization Administrator he and his successor did review the action of the agencies administering the Premium Price Plan, including the assignment of quotas for the period covered by the complaint, and determined them to be proper.

The answer concluded with a motion to dismiss the complaint on the grounds:

1. That the complaint failed to state a claim against the defendant upon which relief could be granted for the matters alleged rest in the discretion of the United States and do not involve contractual or vested rights:

2. The court lacks jurisdiction because:

(a) The action is in substance against the United States, which has not waived immunity from suit or consented to be sued;

(b) The United States is an indispensable party, and cannot be made a party;

(c) Plaintiff has not exhausted the administrative remedies prescribed by § 203 of the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A. Appendix, § 923, in that plaintiff has not protested the quota and subsidy orders in accordance with said § 203.

(d) The action is exclusively within the jurisdiction of the Emergency Court of Appeals under § 204(d) of the Emergency Price Control Act of 1942.

Defendant's motion to dismiss for want of jurisdiction was renewed after plaintiff had rested.

The court overruled both motions on the ground, first, that by the Nelson and President Roosevelt letters the "Government in every way assured a margin of profit to producers in the precise category of this plaintiff. Moreover, it appears further that this was contractual and that such subsidy payments were to be made or to be assured by a corporation formed, as in this case, and known as Metals Reserve Company, a subsidiary of the defendant."

■ We think the court was mistaken in thus construing these letters. They purported only to announce a policy of the government, and the presumption is that they were "not intended to create private contractual or vested rights * * *", Dodge v. Board of Education, 302 U.S. 74, 79, 58 S.Ct. 98, 100, 82 L.Ed. 57, and he who asserts the creation of a contract in such a case has the burden of overcoming the presumption. Nothing in the pleadings nor in the evidence sustains this burden. The letters contain no promise on the part of the government to do anything— they declare a policy only. The rights of plaintiff must be found in the applicable statutes, the regulations and the executive orders made thereunder; and plaintiff claims no contractual right under the statutes or regulations.

The court, however, held, D.C., 82 F. Supp. 455, 457, that since by the Act creating the defendant, 15 U.S.C.A. § 603, it is authorized "to make contracts" and "to sue and be sued, to complain and to defend, in any court of competent jurisdiction, State or Federal", it was in some way a party to the alleged contract resulting from the President's letter of April 24, 1943, supra; and upon this theory it became the duty of defendant's subsidiary, Metals Reserve Company, " * * * to assure or to guarantee to the defendant [plaintiff] as a domestic producer in its operations in marginal mines, 'a fair margin of profit.' It did not do so according to the averments of the complaint, and, since it failed to do so, the defendant having assumed its liabilities, the plaintiff is authorized by express statute to sue the defendant."

■ On the foregoing theory the court assumed jurisdiction. The error in so holding, as shown above, lies in the fact that a government "policy" does not give rise to a contract in and of itself. The announced policy does no more than to authorize the appropriate government agency to enter into a contract consistent with the policy, and in entering into a contract thus permitted the agency is bound to observe and comply with the provisions of the statutes and regulations applicable. In this instance it must be observed that the contract or arrangement under which plaintiff claimed "premiums" was entered into prior to January 1, 1943, and the presidential letter was not written until April 24, 1943.

We think, also, that the court erred in holding that the Emergency Court of Appeals does not have exclusive jurisdiction of the subject matter of the action.

The quotas issued by the Quota Committee of the Premium Price Plan, assailed in this case, were all issued under the au-

thority of § 2(e) of the Emergency Price Control Act of 1942 as amended, 50 U.S. C.A.Appendix, § 902(e). That section, without quoting it at length, provides for subsidy payments to domestic producers "Whenever the Administrator determines that the maximum necessary production of any commodity is not being obtained or may not be obtained during the ensuing year * * * in such amounts and in such manner and upon such terms and conditions as he determines to be necessary to obtain the maximum necessary production thereof * * * such determinations shall be made by the Federal Loan Administrator, with the approval of the President * * * and such subsidy payments to domestic producers thereof may be paid, only by corporations created or organized pursuant to" § 5d of the Reconstruction Finance Corporation Act, as amended.

Section 203 of the Emergency Price Control Act of 1942 as amended, 50 U.S.C.A. Appendix, § 923(a), provides: "At any time after the issuance of any regulation or order under section 2 [section 902 of this Appendix] * * * any person subject to any provision of such regulation, order, or price schedule may, in accordance with regulations to be prescribed by the Administrator, file a protest * * *."

Section 204(a), 50 U.S.C.A.Appendix, § 924(a): "Any person who is aggrieved by the denial or partial denial of his protest may, within thirty days after such denial, file a complaint with the Emergency Court of Appeals * * * specifying his objections and praying that the regulation, order, or price schedule protested be enjoined or set aside in whole or in part."

And § 204(d), 50 U.S.C.A.Appendix, § 924(d): " * * * The Emergency Court of Appeals, and the Supreme Court upon review of judgments' and orders of the Emergency Court of Appeals, shall have exclusive jurisdiction to determine the validity of any regulation or order issued under section 2 [section 902 of this Appendix], of any price schedule effective in accordance with the provisions of section 206 [section 926 of this Appendix], and of any provision of any such regulation, order, or price schedule. Except as provided in this section, no court, Federal, State, or Territorial, shall have jurisdiction or power to consider the validity of any such regulation, order, or price schedule, or to stay, restrain, enjoin, or set aside, in whole or in part, any provision of this Act authorizing the issuance of such regulations or orders, or making effective any such price schedule * * *."

■ The question here is not whether defendant Reconstruction Finance Corporation, or its subsidiaries, may sue and be sued in any court of competent jurisdiction upon claims growing out of either contract or tort, but the question is whether the district court had jurisdiction of the cause of action alleged in the complaint wherein the validity of an order or quota issued pursuant to the provisions of § 2(e) of the Emergency Price Control Act, supra, is assailed. We think that the plain language of the statutes quoted, supra, denies jurisdiction in such a case. We have examined the cases cited by plaintiff, such as Keifer & Keifer v. Reconstruction Finance Corporation, et al., 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784, and we do not think they are in point. And see Swift & Co. v. Reconstruction Finance Corporation, 7 Cir., 183 F.2d 456, and cases cited·therein.

■ Finally, we have no doubt the district court was without jurisdiction for the reason that the suit is in fact a suit against the United States in which plaintiff seeks to recover more than $10,000 and the government has not consented to be sued for such an amount in the district court. 28 U.S.C.A. § 1346(a)(2). It is now settled that this question is not to be determined "by the mere names of the titular parties but by the essential nature and effect of the proceeding, as it appears from the entire record". Ex parte, State of New York, 256 U.S. 490, 500, 41 S.Ct. 588, 590, 65 L.Ed. 1057. The principle of immunity applies to all cases in which the government would be required to make pecuniary satisfaction for any liability. Ex parte, State of New York, supra; Mine Safety Appliances Co. v. Forrestal, 326 U. S. 371, 66 S.Ct. 219, 90 L.Ed. 140; State of Tennessee, by Wolfenbarger ex rel.

Atchley, v. Taylor, 6 Cir., 169 F.2d 626, 632; Atlantic Meat Co. v. Reconstruction Finance Corporation, 1 Cir., 166 F.2d 51, 56. The sole purpose of this suit is to collect money from the government since any judgment obtained against defendant would have to be satisfied from the Treasury of the United States. All such suits against the sovereign are barred in the absence of consent. See cases cited supra, and Land v. Dollar, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209.

For the foregoing reasons the judgment appealed from is reversed and the case remanded with instructions to dismiss the complaint.

MacArthur Mining Company, Inc., appellee, heretofore filed a motion in this court to dismiss this appeal, which motion was denied. In its brief filed herein appellee renews that motion. We have again considered its contentions in this regard and find them to be without merit; and the present motion to dismiss the appeal is, therefore, denied.