**UNITED STATES of America,**
**Plaintiff,**

v.

**BUFFALO COAL MINING COMPANY,**
Inc., Buell Nesbett, W. T. Malcolm, United States Fidelity & Guaranty Company of Baltimore, Maryland, Territory of Alaska, Yukon Equipment Company, Inc., Gould and Gould, Inc., Sisters of Charity of the House of Providence in the Territory (Now State) of Washington, a corporation, Morris Steel Products Company of Birmingham, Alabama, a corporation, Defendants.

**PALMER INDEPENDENT SCHOOL DISTRICT, Plaintiff,**

v.

**BUFFALO COAL COMPANY, Incorporated, Defendant.**

Nos. A-12052, A-12273.

District Court, Alaska,
Third Division, Anchorage.

Feb. 4, 1959.

George Boney, Asst. U. S. Atty., Anchorage, Alaska, for plaintiff United States.

John D. Shaw, Palmer, Alaska, for plaintiff Palmer Independent School Dist.

Buell A. Nesbett, Anchorage, Alaska, for defendants Buffalo Coal Mining Co., Inc., W. T. Malcolm, and Buell Nesbett.

Edward V. Davis, Anchorage, Alaska, for defendants United States Fidelity & Guaranty Co. and Gould & Gould, Inc.

David Pree, Asst. Atty. Gen., of Alaska, for Territory of Alaska.

E. L. Arnell and Donald A. Burr, Arnell & Burr, Anchorage, Alaska, for defendant Yukon Equipment Co., Inc.

McCARREY, District Judge.

Claim for relief No. A–12,052 has been consolidated with No. A–12,273, in conformance with the rules, and without objection.

The subject of this opinion is not related to claim No. A–12,273. Therefore, no reference will be made thereto.

The United States has sued the Buffalo Coal Mining Company, Inc., an Alaska corporation, hereinafter referred to as Buffalo, Buell Nesbett, W. T. Malcolm, United States Fidelity and Guaranty Company, Yukon Equipment Company, Inc., Gould and Gould, Inc., Sisters of Charity of the House of Providence, and Morris Steel Products Company, a foreign corporation,

a. To foreclose its chattel mortgage which secured a promissory note in the sum of $425,775 by Buffalo;

b. For any deficiency judgment which might exist after sale of mortgaged property;

c. For judgment against defendant Nesbett as guarantor, in the sum of $30,000;

d. For judgment against defendant Malcolm as guarantor, in the sum of $20,000;

e. For judgment against United States Fidelity and Guaranty Company and Buffalo Coal Mining Company, Inc., jointly and severally, in the sum of $2,400, for lease rental yet unpaid;

f. For forfeiture and cancellation of the coal mining lease now held by Buffalo;

g. For a decree adjudging defendant Buffalo indebted to the United States for unpaid revenue taxes, etc., in the sum of $28,328.99;

h. "That the Court determine and adjudicate all matters involved herein and determine the merits of all claims to and liens upon the property and rights to property * * *," etc.

Buffalo answered in the usual form and thereafter set up its defenses, neither of which is related to or has any bearing upon the issues to be determined in this opinion. Thereafter, it alleged a counterclaim against Reconstruction Finance Corporation in the sum of $778,083, which claim for relief consists of two segments, although not so denominated, as follows:

a. That the Buffalo Coal Mining Company " * * * had no privilege or opportunity to question or suggest changes in the provisions of any of the documents but was required to accept them as printed and presented by RFC," and while the RFC was obligated to disburse the loan to the Buffalo Coal Mining Company for its use " * * * in rehabilitating and developing the Buffalo Coal Mine, but interpreted said documents as reserving to it the right to refuse to disburse at any time that it felt Buffalo's financial position had changed adversely; that in refusing to disburse the unexpended balance of the loan * * * Buffalo's supplemental loan request represented an 'adverse change' in its financial condition, RFC breached the terms of its loan contract * * *."

b. "That as a result of RFC's refusal to disburse and the unwarranted and negligent failure of agencies of plaintiff to render a decision, Buffalo was forced to suspend all mining operations on March 20, 1953, was shortly thereafter ordered to suspend mine dewatering operations by RFC with the result that the main shaft of the mine filled with water rendering it financially impossible to resume mining operations on the financial schedule set out in the supplemental loan request even if same had been approved; that Buffalo was unable to pay bills for equipment purchased with RFC's approval and already delivered at the mine which resulted in embarrassment to the corporation and law suits; that Buffalo was in the meantime, unable to interest private capital in the enterprise because of its complicated financial arrangement with RFC and its inability to obtain any decision on its supplemental loan request; that Buffalo was prevented from accepting the coal contract commitment offered by the Naval Purchasing Agent thus preventing *its* from keeping the mine in operation even on a limited production schedule."

The Government has filed a motion to dismiss the counterclaim based upon the doctrine of sovereign immunity in that the Government has not consented to be sued in this case.

The defendant Gould and Gould, Inc., has also cross-claimed, after answer, for $10,590.10, plus interests and costs, and the Government has moved to dismiss this claim on like grounds; however, a recitation of the pleadings of this defendant is obviated by the decision of the court on the motion to dismiss against Buffalo.

Prior to the determination of the genuine issue, which concerns defendant

Buffalo's counterclaim, supra, some preliminary aspects must be resolved.

From a close scrutiny of the counterclaim, it appears readily divisible into two parts:

a. Breach of contract based upon the orginal loan agreement.

b. A tort action based upon negligence.

■ The segment of the counterclaim based on the original loan contract is a compulsory counterclaim in that it arose out of the same transaction and occurrence that plaintiff's claim arose from. See Rule 13(a), Fed.R.Civ.P., 28 U.S.C.A. The segment of the counterclaim based on the negligence of certain government agencies in processing the defendant's supplemental loan application is a permissive counterclaim in that it involves facts and circumstances independent of the facts and circumstances involved in plaintiff's claim. See Rule 13(b), Fed.R.Civ.P.

In deciding the question of the applicability of the doctrine of sovereign immunity let us assume initially that the United States is the real party in interest in this case and that it is not suing in its representative capacity as assignee of the assets and liabilities of the now defunct Reconstruction Finance Corporation, hereinafter referred to as R. F. C. If the counterclaim of the defendant were, instead, a claim, the cases hold that the doctrine of sovereign immunity would bar the action. See United States v. Shaw, 1940, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888; United States v. United States Fidelity & Guaranty Co., 1940, 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894; Nassau Smelting & Refining Co. v. United States, 1924, 266 U.S. 101, 45 S.Ct. 25, 69 L.Ed. 190. Query: Does this rule change when a party's would-be claim is converted into a conterclaim by the sovereign's initiative in filing suit?

■ Permission to file both compulsory and permissive counterclaims is given in Rule 13(a) and 13(b), Fed.R.Civ. P. Rule 13(d), Fed.R.Civ.P., which reads as follows, deals with counterclaims against the United States:

"These rules shall not be construed to enlarge beyond the limits now fixed by law the right to assert counterclaims or to claim credits against the United States or an officer or agency thereof."

The case law under Rule 13(d), Fed. R.Civ.P., is to the effect that the rule is to be interpreted literally in all types of actions.

United States v. Finn, 9 Cir., 1956, 239 F.2d 679, 682.

" * * * As regards plaintiff's immunity from suits to which Congress has not given plaintiff's consent, and as regards jurisdiction of such suits, there is no distinction between counterclaims and original suits. Congress never gave plaintiff's consent to the Finns' counterclaim.

"There is no merit in the contention that, by bringing this action, plaintiff gave its consent to the Finns' counterclaim. This action was brought for plaintiff by its attorneys—the United States Attorney for the Southern District of California and two of his assistants. Plaintiff's attorneys were not authorized to give its consent to the Finns' counterclaim, nor did they attempt or pretend to do so. As indicated above, only Congress could have given such consent."

In accord United States v. Thompson, D.C.N.D.W.Va.1957, 150 F.Supp. 674. Thus, unless Congress has given its consent for the Government to be sued, the defendant's counterclaim is barred by sovereign immunity.

Let us then turn to the question of whether Congress has given its consent to sue in cases involving claims or counterclaims based on contracts and torts, like those in the present case.

■ As far as the counterclaim sounding in tort is concerned, I note that it fails to state a claim for relief. See

Rule 12(b)(6), Fed.R.Civ.P. The agencies of plaintiff, whose job it was to pass on defendant Buffalo's supplemental loan application, were under no duty to defendant to act with haste. While it is not a laudable rule, he who deals with governmental agencies, at least as far as deliberate speed is concerned, deals at his own peril. Also, the tort counterclaim has no jurisdictional basis because it is not one of the torts from which Congress has removed the cloak of sovereign immunity. 28 U.S.C.A. § 2680(h) (1957); United States v. Silverton, 1 Cir., 1956, 200 F.2d 824; Waylyn Corporation v. United States, 1 Cir., 1956, 231 F.2d 544. Thus, defendant Buffalo's tort counterclaim not only fails to state a claim for relief, but it also lacks a jurisdictional basis. If the plaintiff United States is suing and being sued in its own right (a question to be decided later in this opinion), the counterclaim sounding in tort will have to be dismissed.

With reference to the counterclaim sounding in contract, I find that Congress has waived the Government's cloak of sovereign immunity to the extent of an affirmative recovery not to exceed $10,000. See the Tucker Act, 28 U.S.C.A. § 1346(a)(2).

While there is considerable authority to the effect that no affirmative recovery may be had in counterclaims against the United States, but only recoupment or offset (United States v. Double Bend Mfg. Co., D.C.S.D.N.Y.1953, 114 F.Supp. 750, 751; United States v. Nipissing Mines Co., 2 Cir., 1913, 206 F. 431; United States v. Joseph Behr & Sons, Inc., D.C.N.D.Ill.1953, 110 F.Supp. 286; United States v. Wissahickon Tool Works, Inc., D.C.S.D.N.Y.1949, 84 F. Supp. 896), I find that this authority is inconsistent with the Supreme Court's views on sovereign immunity. See Keifer & Keifer v. R. F. C., 1939, 306 U.S. 381, 390, 59 S.Ct. 516, 519, 83 L.Ed. 784 where the court said: " * * * the present climate of opinion which has brought governmental immunity from suit into disfavor * * * " and National City Bank of New York v. Republic of China, 1955, 348 U.S. 356, 359, 75 S.Ct. 423, 426, 99 L.Ed. 389, where the court said:

"But even the immunity enjoyed by the United States as territorial sovereign is a legal doctrine which has not been favored by the test of time. It has increasingly been found to be in conflict with the growing subjection of governmental action to the moral judgment. A reflection of this steady shift in attitude toward the American sovereign's immunity is found in such observations in unanimous opinions of this Court as 'Public opinion as to the peculiar rights and preferences due to the sovereign has changed', Davis v. Pringle, 268 U.S. 315, 318, 45 S.Ct. 549, 550, 69 L.Ed. 974; 'There is no doubt an intermittent tendency on the part of governments to be a little less grasping than they have been in the past * * *,' White v. Mechanics' Securities Corp., 269 U.S. 283, 301, 46 S.Ct. 116, 118, 70 L.Ed. 275 ' * * * the present climate of opinion * * * has brought governmental immunity from suit into disfavor * * *,' Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 391, 59 S.Ct. 516, 519, 83 L.Ed. 784. This chilly feeling against sovereign immunity began to reflect itself in federal legislation in 1797. At that early day Congress decided that when the United States sues an individual, the individual can set off all debts properly due him from the sovereign. And because of the objections to ad hoc legislative allowance of private claims, Congress a hundred years ago created the Court of Claims, where the United States, like any other obligor, may affirmatively be held to its undertakings. This amenability to suit has become a commonplace in regard to the various agencies which carry out 'the enlarged scope of government in economic affairs', Keifer & Keifer

v. Reconstruction Finance Corp., supra, 306 U.S. at page 390, 59 S.Ct. at page 518. The substantive sweep of amenability to judicial process has likewise grown apace.

"The outlook and feeling thus reflected are not merely relevant to our problem. They are important. The claims of dominant opinion rooted in sentiments of justice and public morality are among the most powerful shaping-forces in lawmaking by courts. Legislation and adjudication are interacting influences in the development of law. A steady legislative trend, presumably manifesting a strong social policy, properly makes demands on the judicial process. See James M. Landis, Statutes and the Sources of Law, in Harvard Legal Essays (1934), p. 213 et seq.; Harlan F. Stone, The Common Law in the United States, 50 Harv.L.Rev. 4, 13–16."

Besides, the rule stated in the Double Bend case, supra, Nipissing Mines case, supra, Behr case, supra, and the Wissahickon Tool case, supra, is not required by the wording of the Tucker Act, supra. This court believes the rule expressed in United States v. Silverton, supra, United States v. King, D.C.Alaska 1954, 119 F.Supp. 398, 14 Alaska 500 and United States v. United States Tin Corporation, D.C.Alaska 1957, 148 F.Supp. 922, is consonant with reason and justice and, as stated before in United States v. King, supra, it will be followed by this court. Therefore, as to that portion of defendant Buffalo's counterclaim sounding in contract, this court has jurisdiction to decide the issues if the defendant amends its counterclaim to provide for affirmative recovery of no more than $10,000.

The language in the cases of Keifer & Keifer v. R. F. C., supra, and National City Bank of New York v. Republic of China, supra, concerning sovereign immunity should give the government fair warning that in the near future it is going to need a better defense than sovereign immunity against compulsory counterclaims. The doctrine of sovereign immunity was, in the beginning, court-made law, and regardless of the lower courts' reticence to whittle it down, the Supreme Court, in the above cases has indicated it will do so when reasons of justice and morality require it. See Keifer & Keifer v. R. F. C., supra. That the king can do no wrong has been manifestly disproved, and today the reason for the survival of the doctrine of sovereign immunity is to prevent the government's being harassed. The theory of harassment has no meaning when it is employed to defeat a compulsory counterclaim. If the government wishes to be free from suit, let it refrain from filing a complaint when there is a probability of the defendant raising a sufficient compulsory counterclaim. I find that under the present rule, if the defendant has a valid counterclaim and the government wins the race to suit and sues in a district court, the defendant may recover affirmatively no more than $10,000. See United States v. King, supra. If additional damages are sought, they must be recovered by a suit in the court of claims. Certainly the decree of the district court as to the merits of the controversy should be res judicata in the court of claims; then only the issue of the amount of the damages need be further litigated there. This may or may not prove to be the rule. Let us hope that it is. It is a waste of the litigants' and the taxpayers' money to have two courts litigating the same issues in the same case. This type of case should be finalized in one court without duplicity of effort, and I can only hope that Congress or the Supreme Court will see fit to make this possible.

Now to the next issue: Is the Government itself suing and being sued or is it suing as assignee of the assets and liabilities of the now defunct Reconstruction Finance Corporation?

This is similar to the issue the Government raised in Reconstruction Finance Corporation v. MacArthur Mining Co., Inc., 8 Cir., 1950, 184 F.2d 913. The

Government contends that regardless of which position it is suing in, it is protected by sovereign immunity and any recovery made will be paid out of the Treasury of the United States and not the assets of R. F. C. The Government cites a number of cases in support of this proposition: Mine Safety Appliances Co. v. Forrestal, 1945, 326 U.S. 371, 66 S.Ct. 219, 90 L.Ed. 140; State of Tennessee, by Wolfenbarger ex rel. Atchley v. Taylor, 6 Cir., 1948, 169 F.2d 626; Atlantic Meat Co. v. Reconstruction Finance Corporation, 1 Cir., 1948, 166 F.2d 51; and, in particular, Reconstruction Finance Corporation v. MacArthur Mining Co., Inc., supra. In this circuit (9th), these cases are limited and disapproved by the case of Brinker-Johnson Co. v. Reconstruction Finance Corporation, 9 Cir., 1956, 236 F.2d 195, 196, where the court said:

"Appellee has challenged our jurisdiction, claiming that the present action is in substance a suit against the United States which, it is argued, has not waived its sovereign immunity by consent to suit. The short answer to this contention is that § 603 of Title 15 U.S.C.A. expressly provides that R. F. C. may 'sue and be sued.' This provision and the case of Keifer & Keifer v. R. F. C., 1939, 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784, see also R. F. C. v. J. G. Menihan Corp., 1941, 312 U. S. 81, 61 S.Ct. 485, 85 L.Ed. 595, clearly establish that R. F. C. may be sued.

"Appellee cites Atlantic Meat Co. v. R. F. C., 1 Cir., 1948, 166 F.2d 51, and R. F. C. v. MacArthur Mining Co., Inc., 8 Cir., 1950, 184 F.2d 913, as holding to the contrary. These cases deal with peculiar fact situations which persuaded the courts that the actions were not against the R. F. C. but were in fact suits against the United States."

This court believes the reasoning of the Brinker-Johnson case, supra, to be in conformance with the principles of equity and justice enunciated by the Supreme Court in the cases of Keifer & Keifer v. Reconstruction Finance Corporation, supra, and National City Bank of New York v. Republic of China, supra. Such reasoning is also in conformance with the interpretation of 15 U.S.C.A. § 603(a) dealing with the liability of the R. F. C. to suit:

"Sec. 603. *Period of succession; powers; employment of personnel; priority of debts due Corporation; death or injury benefits of employees*

"(a) The Corporation shall have succession until it is dissolved pursuant to the provisions of section 609 of this title. It shall have power to adopt, alter, and use a corporate seal; to make contracts; to lease or purchase such real estate as may be necessary for the transaction of its business; to sue and be sued, to complain and to defend, in any court of competent jurisdiction, State or Federal; to select, employ, and fix the compensation of such officers, employees, attorneys, and agents as shall be necessary for the transaction of the business of the Corporation, in accordance with laws, applicable to the Corporation, as in effect on June 30, 1947, and as thereafter amended; and to prescribe, amend, and repeal, by its administrator, bylaws, rules and regulations governing the manner in which its general business may be conducted. Except as may be otherwise provided in this chapter or in the Government Corporation Control Act, the Administrator of the Corporation shall determine the necessity for and the character and amount of its obligations and expenditures under this chapter and the manner in which they shall be incurred, allowed, paid, and accounted for, without regard to the provisions of any other laws governing the expenditure of public funds, and such determinations shall be final and conclusive upon all other officers of the Government. The Cor-

poration shall be entitled to and granted the same immunities and exemptions from the payment of costs, charges, and fees as are granted to the United States pursuant to the provisions of law codified in sections 551, 604, 751, 1913, 1914, and 1923 of Title 28. The Corporation shall also be entitled to the use of the United States mails in the same manner as the executive departments of the Government. Debts due the Corporation, whether heretofore or hereafter arising, shall not be entitled to the priority available to the United States pursuant to section 191 of Title 31 except that the Corporation shall be entitled to such priority with respect to debts arising from any transaction pursuant to any of the following Acts or provisions in effect at any time: Sections 5d(1) and 5d(2) of the Reconstruction Finance Corporation Act added by section 5 of the Act entitled 'An Act to authorize the purchase by the Reconstruction Finance Corporation of stock of Federal home-loan banks; to amend the Reconstruction Finance Corporation Act, as amended, and for other purposes', approved June 25, 1940 (54 Stat. 573); sections 4(f) and 9 of the Act entitled 'An Act to mobilize the productive facilities of small business in the interests of successful prosecution of the war, and for other purposes', approved June 11, 1942 (56 Stat. 354, 356); section 2(e) of the Emergency Price Control Act of 1942 (56 Stat. 26); the Surplus Property Act of 1944 (58 Stat. 765 and the following); sections 11 and 12 of the Veterans' Emergency Housing Act of 1946 (60 Stat. 214, 215); and section 403 of the Sixth Supplemental National Defense Appropriation Act (56 Stat. 245). As amended July 30, 1953, c. 282. Title I, Sec. 102(a), 67 Stat. 230; June 29, 1954, c. 410, § 2(b), 68 Stat. 320."

See also Reconstruction Finance Corporation v. Breeding, 10 Cir., 1954, 211 F. 2d 385 and Reconstruction Finance Corporation v. J. G. Menihan Corp., 1941, 312 U.S. 81, 61 S.Ct. 485, 85 L.Ed. 595. Thus, if the R. F. C. were the party conducting the contracting with the Buffalo Coal Company, its assignee, the United States, should be held to all the rights and liabilities of the R. F. C. under 15 U.S.C.A. § 603(a), regardless of where the money to pay the final judgment came from.

This leads me to the final question which is dispositive of this case: Whether the R. F. C., when it makes a loan under Sec. 302 of the Defense Production Act of 1950 (50 U.S.C.A.Appendix, §§ 2092–2094), is acting as a principal or an agent. If it is acting as a principal, then 15 U.S.C.A. § 603(a), supra, applies and it, or its assignees, may sue and be sued; if it is acting as a conduit or agent for another branch of the government cloaked with sovereign immunity, then this sovereign immunity descends to R. F. C.

There are no cases directly in point on this subject. United States v. United States Tin Corporation, supra, is somewhat in point except the loan in that case was made through the General Services Administration, which has sovereign immunity (5 U.S.C.A. § 630). Hence, that decision is not clear on what grounds the counterclaim was denied—whether it was G.S.A.'s sovereign immunity or the fact that the loan was made under Sec. 302 of the Defense Production Act of 1950, supra.

United States v. Jones, 10 Cir., 1955, 229 F.2d 84 indicates, by way of awarding preference to a loan made under Sec. 302 of the Defense Production Act of 1950, supra, that the R. F. C. acts as an agent or conduit in granting loans under this act because 15 U.S.C.A. § 603(a), supra, gives R. F. C. no sovereign priority when it makes a loan under its usual powers. In accord is a case in bankruptcy in New York: In the Matter of Premier Mill Corporation, 171 F.Supp.

733, dated April 24, 1956, by Harold P. Burke, United States District Judge. At the end of 15 U.S.C.A. § 603(a), supra, the R. F. C. is specifically given the sovereign's priority in the matter of collections of debts due under a number of enumerated war and emergency acts passed by Congress which gave R. F. C. varying powers of administration. If the R. F. C. is due the sovereign's priority in the collection of debts under Sec. 302 of the Defense Production Act of 1950, supra, why wasn't it enumerated? One can only conclude that it was either because R. F. C. was not to have priority by will of Congress, or Congress believed R. F. C. was only a conduit for loans under the above Act. The latter is the only reasonable view because Defense Production Act Loans to private business enterprises through the R. F. C. were authorized by Executive Order. See Executive Order No. 10281, Part III, Aug. 30, 1951 (16 F.R. 8789). 50 U.S.C.A.Appendix, § 2071 note; U.S.Code Cong.Service 1951, pp. 1076, 1078. This order reads as follows:

"Part III. Loans to Private Business Enterprises

"Sec. 301. Part III of Executive Order No. 10161 of September 9, 1950, as amended,[11] is hereby further amended by adding after section 309 thereof (as added by Part II of this Executive order) the following new sections:

"Sec. 310. (a) The Reconstruction Finance Corporation is hereby authorized and directed to make loans (including participations in, or guarantees of, loans) to private business enterprises (including research corporations not organized for profit) for the expansion of capacity, the development of technological processes, and the production of essential materials, including the exploration, development, and mining of strategic and critical metals and minerals, exclusive of such expansion, development and production in foreign countries, as authorized by and subject to section

302 of the Defense Production Act of 1950, as amended, and within such amounts of funds as may be made available pursuant to the Defense Production Act of 1950, as amended.

"(b) Loans under section 310 (a) hereof (1) shall be made upon such terms and conditions as the Corporation shall determine, (2) shall be made only after the Corporation has determined in each instance that financial assistance is not available on reasonable terms from private sources or from other governmental sources, and (3) except in the case of working capital loans (involving no more than minor expansion of capacity which is incidental to a loan for working capital) shall be made only upon certificate of essentiality of the loan, which certificate shall be made by the Secretary of Agriculture with respect to food and food facilities and by the Defense Production Administrator with respect to all other materials and facilities.

"(c) Applications for loans under section 310(a) hereof shall be received from applicants by the Corporation or by such agencies of the Government as the Corporation shall designate for this purpose.

"Sec. 311. (a) The Export-Import Bank of Washington is hereby authorized and directed to make loans (including participations in loans) to private business enterprises, for the expansion of capacity, the development of technological processes, and the production of essential materials, including the exploration, development, and mining of strategic and critical metals and minerals, in those cases where such expansion, development or production is carried on in foreign countries, as authorized by and subject to section 302 of the Defense Production Act of 1950, as amended, and within such amounts of funds as may be made available pursuant

to the Defense Production Act of 1950, as amended.

"(b) Loans under section 311(a) hereof (1) shall be made upon such terms and conditions as the said Bank shall determine, (2) shall be made only after the Bank has determined in each instance that financial assistance is not available on reasonable terms from private sources and that the loan involved cannot be made under the provisions of and from funds available to the Bank under the Export-Import Bank Act of 1945, as amended, and (3) shall be made only upon certificate of essentiality of the loan, which certificate shall be made by the Secretary of Agriculture with respect to food and food facilities and by the Defense Production Administrator with respect to all other materials and facilities.

"(c) Applications for loans under section 311(a) hereof shall be received from applicants by the said Bank or by such agencies of the Government as the Bank shall designate for this purpose."

"[11] 50 U.S.C.A.Appendix, § 2071 note."

An argument can still be made from a reading of this Executive Order, supra, that the R. F. C. is more than a conduit or an agent for the reason that it acts in almost the same manner as it would act if the loan were made under its regular lending powers. This argument has substantial merit and under the rule of strict construction of sovereign immunity enunciated by the Supreme Court in Keifer & Keifer v. Reconstruction Finance Corporation, supra, and National City Bank of New York v. Republic of China, supra, it might prevail. This is obviously a close question. However, one must look to the source of power to determine its limits. The source of the R. F. C.'s power in this case is directly from the President by executive order (Executive Order 10281, supra), not from Congress by any specific statute denoting R. F. C.'s powers and liabilities. This, coupled with the fact that loans made under Sec. 302 of the Defense Production Act of 1950, supra, were meant to be of a high risk type needed only as an emergency measure for the self-preservation of the sovereign and thereby its subjects, leads me to hold that the provisions of 15 U.S.C.A. § 603(a) dealing with R. F. C.'s power to sue and be sued are inapplicable when the loan is made under Sec. 302 of the Defense Production Act of 1950, supra. This holding is also in conformance with the reasoning based on the factual situation of the principal and agency relationship in the case of Keifer & Keifer v. Reconstruction Finance Corporation, supra.

Thus, the Court holds as follows:

1. That Buffalo Coal Mining Company, Inc., may maintain its counterclaim sounding in contract against the United States as long as it claims no more than $10,000 in affirmative relief.

2. That Buffalo Coal Mining Company, Inc., may not maintain its counterclaim sounding in tort against the United States as there is no provision in any statute waiving the United States' sovereign immunity in this matter.

3. That the United States may not be sued in its capacity as assignee of the assets and liabilities of the R. F. C. for any damages pursuant to loans made under the provisions of the Defense Production Act of 1950 except in accordance with the provisions of the Tucker Act, supra, and other Congressional Acts waiving the sovereign's immunity with the exception of 15 U.S.C.A. § 603(a) as it applies to the R. F. C.

Therefore, defendant Buffalo Coal Mining Company, Inc.'s counterclaim is dismissed with leave to amend in conformance with this opinion.